**In re Milus Wesley HENDRY, Dana Diane Hendry.**

**MERIDIAN PRODUCTION CREDIT ASSOCIATION**

v.

**Milus Wesley HENDRY and Dana Diane Hendry.**

**Bankruptcy No. 8300567MC. Adv. No. 830431MC.**

United States Bankruptcy Court, S.D. Mississippi, Jackson Division.

April 17, 1987.

Harvey B. Ray, Meridian, Miss., for plaintiff, Meridian Production Credit Ass'n.

Robert Alan Byrd, Biloxi, Miss., for defendants, debtors, Milus Wesley Hendry and Dana Diane Hendry.

## ORDER ON "AMENDED OBJECTION OR COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT, LIFTING OF AUTOMATIC STAY AND MONETARY JUDGMENT" FILED BY MERIDIAN PRODUCTION CREDIT ASSOCIATION

EDWARD ELLINGTON, Chief Judge.

On March 21, 1983, the Defendants, Milus Wesley Hendry and Dana Diane Hendry, filed with this Court their petition under Chapter 11 of the Bankruptcy Code. On August 31, 1983, Meridian Production Credit Association filed an "Objection to Discharge of Debt." The complaint was twice amended and the Amended Complaint alleges that a debt of the Defendants owed to Meridian Production Credit Association (hereinafter PCA) is nondischargeable in bankruptcy under the provisions of 11 U.S.C. § 523(a)(6). The Debtors' case was subsequently converted to a Chapter 7 of the Bankruptcy Code on April 16, 1984. PCA's complaint came on for trial on May 6, 1986.

After reviewing the evidence presented at trial and considering the briefs of counsels, this Court finds that the Defendant's debt to PCA is nondischargeable in bankruptcy.

### STATEMENT OF THE CASE

Milus Wesley Hendry was a cattle farmer that engaged in business in Jasper County, Mississippi. Hendry's operation became quite extensive, and he transacted business not only in his individual name, but also as the Bar W Ranch, Wesley Hendry Land and Cattle Company, Inc. and the Central Mississippi Livestock Exchange.

Commencing in early 1981, Hendry began doing business with PCA. PCA loaned money to Hendry for, among other things, the purchase of cattle. The parties executed two security agreements dated November 21, 1980, and December 18, 1981. The 1980 security agreement listed 350 head of cattle as collateral and the 1981 security agreement listed 2,431 head of cattle as collateral. It is important to note that the 1981 agreement contained an "after acquired property" clause securing any additional cattle as well as proceeds. To perfect its security interest, PCA filed a UCC–1 Financing Statement with the Chancery Clerk of Jasper County, Mississippi on November 24, 1980. PCA also filed UCC–1 Financing Statements with the Chancery Clerk of Jasper County, Mississippi on March 15, 1982, and with the Mississippi Secretary of State on May 14, 1982.

The validity of the security agreements in this case has not been contested. However, the Debtor has disputed the effect of the UCC–1 Financing Statements filed by PCA. The Debtor contends that PCA's security interest is unperfected and thus PCA is not properly secured. PCA contends that this implication is without merit.

Although both security agreements required PCA's written permission to sell the cattle, there is undisputed testimony that this permission was waived and that Hendry could sell the cattle without first obtaining PCA's approval. Both parties also agree that there was an understanding between them that the proceeds from the sales would be turned over to PCA.

However, in addition to PCA, Hendry did business with other lenders, which also made loans to the Debtor for the purpose of buying and selling cattle. Hendry's testimony provided that the cattle, including PCA's collateral, were sold and the proceeds from the cattle sales were used by the Debtor to pay the creditor that was pressing him the most at any given time. Cattle sale proceeds were also utilized for the Debtor's farming operations, for fertilizer and labor expenses. Hendry testified that all cattle proceeds were utilized to pay creditors on farming operations and that he did not retain or receive the benefit of any cattle sale proceeds individually.

Hendry introduced evidence and testified that during 1981 and 1982, that he paid PCA in excess of 1.8 million dollars. PCA disputed that testimony and contends that the fact that the loan documents which were introduced into evidence show that sums of money were credited to Hendry's account does not mean that each of these was a payment. PCA explained that the debt owed to it was from a series of notes, advances and renewal loans. When a renewal of a loan was made, a credit was given for the amount of the previous outstanding balance in order to close the previous account. On September 28, 1983, when the Hendry account was charged off to clear the books, the final account balance was $600,501.55.

In February, 1983, a representative of PCA visited Hendry to take an inventory of his cattle and to discuss the possibility of another loan. Hendry took the PCA representative and another creditor to different farm locations and showed the two creditors approximately 1,000 head of cattle. Hendry testified that none of the cattle in which PCA inventoried for its records at that time were cattle in which PCA had a security interest. In fact, the Debtor did not even own all the cattle which were counted by PCA at that time. The Debtor further testified that he had sold the last of PCA's cattle in November and December of 1982. The Debtor did not inform PCA that all of its collateral had been sold until sometime in March, 1983.

On March 21, 1983, Milus Wesley Hendry and Dana Diane Hendry filed with this Court their petition under Chapter 11 of the Bankruptcy Code. On August 31, 1983, PCA filed an "Objection to Discharge of Debt." The Complaint was twice amended and the Amended Complaint alleges that the debt owed to PCA is nondischargeable in bankruptcy under section 523(a)(6) of the Code. The Debtors' case was converted to a Chapter 7 on April 16, 1984. PCA's complaint came on for trial on May 6, 1986, and thereafter both parties submitted briefs for the Court's consideration.

Dana Diane Hendry is named as a defendant in this proceeding but both parties agree that neither her name nor signature appear on PCA's security agreements. Thus, PCA has agreed to dismiss its complaint as to her.

## DISCUSSION

The validity of the security agreements in this case is not in question. The Debtor has never challenged their authenticity or any other provisions or qualifications of the documents. However, the Debtor has raised the issue of the filing of the UCC–1 Financing Statements and has alleged that PCA is not properly secured.

This Court notes that the purpose of filing the financing statements is for notice to third parties. However, this adversary

proceeding before the Court is strictly a case of a dispute between debtor and creditor and there is no question that a valid security interest was acquired by PCA as between it and Hendry. Hendry admitted that he gave PCA a security interest in the cattle shown on the security agreement.

Mississippi's Uniform Commercial Code which deals with secured transactions does not require that a creditor "perfect" his security interest in order to have a valid interest in the debtor's property. *Mississippi Code Annotated,* 75-9-301. PCA cites two cases for the Court's consideration specifically stating that a creditor's security interest need not be "perfected", *Anderson v. First Jacksonville Bank,* 243 Ark. 977, 423 S.W.2d 273, 4 U.C.C.R.S. 1071 (1968) and *Application of County Treasurer of DuPage County,* 16 Ill. App.3d 385, 306 N.E.2d 743 (1973).

*Anderson* is an Arkansas case which explains that section 85-9-301 of the Arkansas state code, which code section is identical to section 75-9-301 of the *Mississippi Code Annotated* (1972), does not apply between a debtor and creditor but against third parties. In *Anderson* a bank brought a replevin action against a debtor who was in default under a note held by the bank and secured by an automobile. The Arkansas Supreme Court held that the Motor Vehicle Act which required all liens and encumbrances to be noted on the certificate of title did not apply as between the bank and the debtor and that the bank's failure to have the chattel mortgage noted on the certificate of title did not prevent it from obtaining possession of the automobile after the debtor defaulted on the note to the bank. The Court in *Anderson* stated:

Sections 85-9-301 to 85-9-304 are not here applicable. Those sections concern priorities of perfected or unperfected security interests as against third parties. This being a suit between the parties, Ark.Stat.Ann. §§ 85-9-201 to 85-9-204 (Add.1961) control. Section 85-9-201 reads "Except as otherwise provided by this Act, a security agreement is effective according to its term between the parties ...". ... Section 85-9-203 provides that the only requirements for an enforcable security interest against a debtor are: (a) a written agreement; (b) the debtor's signature; and (c) a description of the collateral. In the case before us all the requirements are met. So, according to Section 85-9-204, the security interest here attaches immediately because no explicit agreement postponed the time of attaching.

. . . . .

Appellant argues that the unencumbered title remained in her possession and that the Bank's security interest was unperfected. As earlier stated, it is not determinative as between the parties whether the interest is perfected, only that it has attached.

*Anderson,* 423 S.W.2d 273 at 274.

*Application of County Treasurer of DuPage County* is an Illinois case which agrees with Anderson's interpretation of the Uniform Commercial Code. *Application of County Treasurer of DuPage County* is a case concerning a tax deed and the right to redemption from a tax sale. The petitioner in the case admitted that he had given an assignment which created a security interest governed by Article 9 of the Uniform Commercial Code. However, the petitioner agreed that since the other party had failed to file a financing statement to perfect his security interest, the other party was merely a creditor with an unperfected security interest and thereby lacks sufficient interest to redeem. The Appellate Court of Illinois held:

Lack of perfection of a security interest under Article 9 of the Uniform Commercial Code relates only to priority over other creditors' interest in the collateral. (Ill.Rev.Stat.1971, ch. 26 pars. 9-301, 9-312; 69 Am.Jur.2d, Secured Trans. sec. 379). The security agreement between the parties themselves and the secured party's rights over the collateral as against the debtor are unaffected by failure to perfect the security interest. (Ill. Rev.Stat.1971, ch. 26 pars. 9-201, 9-204, 9-501, 69 Am.Jur.2d, Secured Trans. sec. 379).

At page 749.

In the present case, there is no question that a valid security interest exists between Hendry and PCA. Thus, the issue of whether PCA is a "perfected" secured creditor is of no consequence to this proceeding.

PCA bases its complaint on section 523(a)(6) of the Bankruptcy Code, which provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

Thus, the question before the Court narrows as to specifically whether Hendry's actions of converting the collateral of PCA causes the debt to fall within the section 523(a)(6) "willful and malicious" exception to discharge and thereby rendering the debt nondischargeable.

In *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the Supreme Court interpreted the parallel provision of § 523(a)(6), which is § 17(a)(2) of the Act, and determined that "a specific intention to hurt a particular person" was not an element of the term "malicious." The Court stated:

We think a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously so as to come within the exception.

193 U.S. at 487, 24 S.Ct. at 509.

However, the legislative history of § 523(a)(6) provides in the Committee Reports of the United States House of Representatives and Senate that:

Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902

[1904]), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

Senate Rep. No. 95–989, 95th Cong., 2d Sess. (1978), 77–80, U.S.Code Cong. and Admin.News 1978, 5787, 5865; see also House Rep. No. 95–595, 95th Cong., 1st Sess. (1977), 365, U.S.Code Cong. and Admin.News 1978, 5787, 6320.

It is clear from the legislative history that "willful" means a deliberate or intentional action. However, a question remains as to the meaning of the term "malicious." The definition of the term has been inconsistent by the Courts and thus two standards have evolved.

One line of cases requires an act with an actual, conscious intent to cause injury or harm to the creditor. See *In re Hodges*, 4 B.R. 513, 2 C.B.C.2d 566 (Bkrtcy.W.D.Va. 1980); *In re Graham*, 7 B.R. 5, 2 C.B.C.2d 695 (Bkrtcy.D.Nev.1980); *In re Shuck*, 13 B.R. 461, 3 C.B.C.2d 128 (Bkrtcy.M.D.Pa. 1980); *In re Long*, 774 F.2d 875, 13 C.B. C.2d 1036 (8th Cir.1985). This line of cases is cited by the Debtor and encourages the Court to adopt this higher standard of the debtor having to have the conscious intent to harm PCA.

A second line of cases has continued to adopt the *Tinker* standard of implied or constructive malice and requires an intentional act which results in injury or harm to the creditor. *In re McCloud*, 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980); *In re Clark*, 30 B.R. 685 (Bkrtcy.W.D.Okl.1983); *In re Haynes*, 54 B.R. 20 (Bkrtcy.W.D.Wis.1985); *Ford Motor Credit Co. v. Klix*, 23 B.R. 187, 7 C.B.C.2d 276 (Bkrtcy.E.D.Mich.1982). "These cases require that the debtor know that his act will harm another and proceed in the face of that knowledge." *Ford Motor Credit Co. v. Klix*, 23 B.R. at 190, 7 C.B.C.2d at 279. "If an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice." *McCloud*, at 825–26.

This Court finds that the standard adopted by the United States Fifth Circuit

Court of Appeals, which is controlling here, is the interpretation of "willful and malicious" set forth in *Collier on Bankruptcy*, the leading bankruptcy treatise. See *Vickers v. Home Indemnity Company, Inc.*, 546 F.2d 1149 (5th Cir.1977); *Matter of Dardar*, 620 F.2d 39 (5th Cir.1980); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th Cir.1983); *Matter of Quezada*, 718 F.2d 121 (5th Cir.1983). See also *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986). *Collier* provides:

> In order to fall within exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional", a deliberate or intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 *Collier on Bankruptcy* § 523.16 at 523–128 (15th ed. 1983).

Thus, when a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure. *Cecchini* at 1443.

The evidence reveals that all transactions between PCA and Hendry were handled rather loosely. PCA had given Hendry permission to sell his cattle without first notifying PCA and obtaining its approval. Although there is undisputed testimony that PCA had an understanding with Hendry that all proceeds should be turned over to PCA, Hendry was free to sell his cattle as he wished and retain control over the proceeds after the sale. Thus, Hendry admitted that he knowingly would take the proceeds and use them to pay other creditors that were pressing him or use the money for his daily farming operations.

In February, 1983, a representative of PCA visited Hendry to take an inventory of his cattle to check their records and to discuss the possibility of another loan. Hendry took the PCA representative and another creditor to different farm locations and showed the two creditors approximately 1,000 head of cattle. Hendry testified that none of the cattle in which PCA inventoried for its records at that time were cattle in which PCA had a security interest. In fact, the Debtor did not even own all the cattle which were counted by PCA at that time. Hendry had sold the last of PCA's cattle in November and December of 1982 and did not inform PCA that all of its collateral had been sold until sometime in March, 1983.

This Court finds that there is no question that Hendry did intentionally and deliberately, and thus willfully, convert the collateral of PCA. The Debtor testified that he knowingly would take the proceeds from the cattle sales and use them to pay other creditors or use them for his farming operation. It is clear Hendry intended to convert PCA's collateral.

The Court must next determine if the actions of Hendry constitute malice within the standard adopted by the Fifth Circuit and thus this Court, i.e. whether the actions of Hendry were wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. This Court finds that the actions taken by Hendry were in an effort to help himself and not to specifically cause harm or injury to PCA. The Court further finds that there was no personal hatred, spite or ill-will behind the Debtor's actions, and thus, the Debtor's actions were not malicious in that sense.

However, the Debtor's conduct was malicious in fact, in that his actions resulted in harm and detriment to PCA. Hendry admitted that he had sold the last of PCA's collateral in November and December of 1982. He also stated that he had not turned over the proceeds to PCA as was the understanding between the parties, but had retained the funds to pay other creditors and other expenses of his daily farming operations. When a PCA representative visited Hendry in February, 1983 to inspect its collateral, the Debtor took the representative to count cattle in which PCA

had no security interest or either the Debtor himself did not own. Such conduct by a Debtor to cover up his prior actions and continue to defraud a creditor are considered by this Court to be wrongful and without just cause or excuse and cannot be taken lightly. Thus, this Court specifically finds that Hendry's actions in converting the collateral of PCA resulted in injury and harm to PCA and is considered to be "malicious" within the exception to discharge under section 523(a)(6).

## CONCLUSION

For the reasons set out herein, it is the Court's opinion that because the Debtor's conversion of PCA's collateral was both willful and malicious in nature, the debt at issue comes within the exception provided by section 523(a)(6) and accordingly is not dischargeable.

THEREFORE, IT IS ORDERED that the debt owed to Meridian Production Credit Association by Milus Wesley Hendry is not discharged by his bankruptcy petition.

IT IS FURTHER ORDERED that the automatic stay pursuant to section 362 of the Code shall be removed and Meridian Production Credit Association will be allowed to proceed with its collection remedies outside of this Court.