In re Robert T. GRIER and Christine
Grier, Debtors.

AMERICAN HONDA FINANCE
CORP., Plaintiff,

v.

Robert T. GRIER, Defendant.

Bankruptcy No. 90–50696–C.
Adv. No. 90–5195–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Jan. 4, 1991.

Peter James Stanton, San Antonio, Tex., for Grier.

Sarah Foster, Austin, Tex., for American Honda.

## MEMORANDUM DECISION

### LEIF M. CLARK, Bankruptcy Judge.

This matter comes before the court on a complaint to determine dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(6), filed by American Honda Finance Corporation against Robert T. Grier. Based upon the pleadings, documents, and the transcript of a trial, as well as the respective memoranda of law submitted by the parties, the court having considered same hereby finds as follows.

## JURISDICTION

This court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a) and 11 U.S.C. § 523(a)(6) and may enter a final order with respect thereto, per 28 U.S.C. § 157(c)(2). Pursuant to 28 U.S.C. § 157(b)(2)(I) this matter is a core proceeding.

## FACTUAL BACKGROUND

The defendant, Robert T. Grier, was the president and sole shareholder of Kendall County Rentals & Sales, Inc. ("KCR") from its incorporation in 1978 through its dissolution in 1989. KCR was an equipment sales and rental business. At one time KCR had over 30 employees.

Much of the equipment that KCR held as inventory for sale or rent was financed through floor planning arrangements with a variety of lenders. Under these arrangements the financier actually paid the manufacturer for the equipment purchased by KCR for resale to the public and took a security interest in the equipment inventory. Typically, floor plan financiers are repaid out of the proceeds on each sale of equipment, thereby paying down the loan balance. An interest accrual on the overall loan balance is of course an integral component of these floor planning arrangements.

Grier had negotiated numerous floor planning arrangements with a number of financial institutions over the years on behalf of KCR. He understood how the security agreement worked in these transactions including the one at issue. He knew from experience what his obligations were. He also knew what the lender expected.

KCR began doing business with American Honda ("AHFC") in 1983. In September of 1985, Grier, as president of KCR, executed a Security Agreement between KCR and American Honda, along with a Financing Statement which was filed by AHFC with the Secretary of State. The Security Agreement granted AHFC a security interest in all inventory for which AHFC provided financing as well as proceeds of that inventory and accounts receivable related to KCR's sale and servicing of Honda products. The entire transaction was a typical floor plan financing arrangement.

Grier also signed a Continuing Personal Guaranty of all indebtedness of KCR to AHFC. In this guaranty, Grier agreed to indemnify AHFC against any losses or expenses suffered by AHFC as a result of any wrongful act by KCR.

In June 1988, KCR was indebted to AHFC in the amount of $15,070.19, after a peaceable surrender of all remaining collateral held by KCR. AHFC alleges that some floor plan inventory was sold out of trust and that the monies were used by Grier and KCR to pay other creditors, in violation of the Security Agreement. Grier maintains that he had no personal knowledge of the sale of each piece of collateral and that his business practice had always been to remit the funds to AHFC when cash flow permitted rather than to account and remit payment for each individual immediately. AHFC, over the years, acquiesced in this business practice. He adds that he never acted with malicious intent toward AHFC. The record supports this contention.

## DISCUSSION

The ultimate issue before this court was aptly summarized by Professor Thomas H. Jackson: "How can the law accommodate both the need to ensure the availability of discharge and the need to ensure the availability of credit?" T. Jackson, *The Fresh Start Policy in Bankruptcy*, 98 Harv.L. Rev. 1393, 1431 (1985). More specific to this case, how does a court balance the need for discharge with the need to ensure the availability of floor plan financing?

▉ Exceptions to discharge are strictly construed in deference to the long established policy that discharge provisions should be construed in favor of the debtor in order to give financially distressed debtors a fresh start in life; thus the burden is on the creditor to prove any exception to discharge by clear and convincing evidence. *In re Morrison*, 110 B.R. 578 (Bankr.M.D. Fla.1990); *Matter of Foreman*, 906 F.2d 123, 126 (5th Cir.1990) ("[u]nder the current Bankruptcy Code, a number of exceptions to the dischargeability of debts exist. Such exceptions to dischargeability are narrowly construed and the burden of proving the nondischargeability of a debt rests on the creditor seeking to prevent discharge"); *see In re Coffee*, 103 B.R. 825 (Bankr.S.D. Tex.1987) ("[e]xceptions to discharge are construed narrowly in light of the overriding purpose of the bankruptcy laws, which is the comprehensive relief from virtually all indebtedness"). The burden of proof is by the clear and convincing standard. *Matter of Foreman*, 906 F.2d 123, 128 (5th Cir.1990) (dictum).[1]

By the same token, this fresh start policy is counter balanced by considerations codified in Sections 523 and 727. There is clear congressional intent that individuals not be permitted to discharge debts resulting from certain kinds of disapproved conduct: "credit ... obtained by false pretenses ..." § 523(a)(2); "fraud ... embezzlement or larceny ..." § 523(a)(4); and "a willful and malicious injury by the debtor to another entity or to the property of another entity" § 523(a)(6).

▉ In Section 523(a)(6), "willful" means "deliberate or intentional". Notes of Committee on the Judiciary, House Report, No. 595, 95th Cong., 2d Sess. 363 (1977) U.S.Code Cong. & Admin.News 1978, p. 5787; *see In re Posta*, 866 F.2d 364, 367 (10th Cir.1989) (quoting *In re Clayburn*, 67 B.R. 522, 525 (Bankr.N.D. Ohio 1986) ("willful" conduct is conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct.")). "Willful means intentional and malicious adds the absence of just cause or excuse". *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983); *Matter of Dardar*, 620 F.2d 39, 40 (5th Cir.1980).

▉ Debtor has admitted that he made a "conscious" decision in his financial matters, when acting as president and sole shareholder of KCR, to pay one creditor over another. Grier realized that the proceeds from the sale of AHFC inventory which he directed to be paid to other creditors were monies owed exclusively to AHFC by virtue of their Security Agreement and the floor plan financing arrangement. Debtor admits that he both read and understood the Security Agreement. Debtor is concededly experienced in business matters and related concerns. This is evidenced, in part, by the fact that debtor, at one point, had over 30 employees and was able to operate in business for over 9 years. Grier's act, then, of applying AHFC's proceeds to other claims in derogation of AHFC's rights was "willful" within the meaning of Section 523(a)(6).

▉ The question here is whether, as a matter of policy, violations of floor plan financing arrangements should be deemed "malicious" as a- matter of law for purposes of Section 523(a)(6). AHFC, over the term of the floor plan arrangement, acquiesced to being paid in a manner that

---

1. As in *In re Powell*, 88 B.R. 114 (Bankr.W.D. Tex.1988), this court still believes that the preponderance of the evidence standard should be applied in dischargeability actions. *See In re Stowell*, 102 B.R. 589, 597 (Bankr.W.D.Tex.1989) (holding to that effect). The court will in this case nonetheless follow the "strong dicta" announced by the Fifth Circuit in *Foreman*.

resulted in a *de facto* modification of the original Security Agreement. Under these facts, was Grier's conduct the type of proscribed activity Congress had in mind when it enacted Section 523(a)(6)?

It would not be difficult for the court to find support for the proposition that Grier's conduct should be characterized as malicious under Section 523(a)(6). *See Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1264 (11th Cir.1988) (the act of selling collateral in violation of a security agreement can constitute willful and malicious injury to a creditor); *In re Watkins*, 90 B.R. 848 (Bankr.E.D.Mich.1988). The malicious aspect of debtor's conduct "can be inferred from the debtors experience in business ... or by [an] admission that [debtor] has read and understood the security agreement." *In re Cullen*, 71 B.R. 274, 282 (Bankr.W.D. Wis.1987); *see also, In re Nash*, 55 B.R. 5, 7 (Bankr.W.D.Wis.1985) (sale of secured property in violation of security agreement is willful and malicious).[2]

The Fifth Circuit takes stricter view of the term, however, and requires a court to determine whether the conduct in question was "without just cause or excuse". *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983); *Matter of Dardar*, 620 F.2d 39, 40 (5th Cir.1980). The Bankruptcy Appellate Panel for the Ninth Circuit has taken a similar position, treating the breach of a security agreement as a mere technical conversion and requiring a stronger showing of malice than may simply be inferred from the breach itself. *In re Littleton*, 106 B.R. 632, 638 (9th Cir.BAP 1989). Under these authorities, the court must look beyond the breach to the surrounding circumstances to divine whether there was some legitimate (or equitable) justification for the debtor's conduct.

The court must utilize an *objective*, rather than a subjective, standard when evaluating surrounding circumstances against the "without just cause or excuse" standard. *See Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480, 486 (5th Cir.1986) (gambling $100,000 of floor plan financing proceeds in Las Vegas to win enough money to get out of financial trouble was not a just cause or excuse); *In re Hendry*, 77 B.R. 85, 90 (Bankr.S.D. Miss.1987) (a finding of malice may be made even in the absence of hatred, spite, or ill will).

In this case, Grier made a conscious decision not to pay AHFC the proceeds from the sale of AHFC collateral when due under the Security Agreement. The decision was based, however, upon Grier's good faith belief that monies would come in eventually from the cash flow generated by his ongoing business, and that AHFC would be repaid out of that cash flow, as it had been before over the years. Grier saw no harm.[3] Grier's decision grew out of a long-standing practice between him and AHFC which allowed him to, as a practical matter, "modify" the payment structure imposed in the Security Agreement, paying AHFC's audit representative when he came in on his quarterly visits, instead of paying immediately. This time, when the audit representative showed up, Grier did not have the money to pay him. The evidence does not show that Grier tried to hide the fact that he had sold the items. In fact, he spent the next nine months or so (evidently with AHFC's cooperation) continuing in business in the hope of generating the money to repay AHFC. The evidence also shows that Grier operated the same way with his other floor plan financers, and that many of them were left in the same position as was AHFC.

Should Grier's business practice be characterized as malicious within the meaning

---

**2.** Debtor's reliance on *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) is misplaced as *Tinker*, for the proposition asserted, was superseded by the Bankruptcy Code. *In re Mclemore*, 94 B.R. 903, 905 (Bankr.N.D.Miss. 1988).

**3.** Were the "just cause or excuse" standard applied subjectively, this evidence alone would be sufficient to deny AHFC relief. The obvious danger of employing such a standard is that the court and creditors would be at the mercy of a debtor's self-serving protestations of innocence, an approach that would make a mockery of Section 523(a)(6).

of Section 523(a)(6), or do these circumstances constitute the sort of just cause or excuse that would permit the resulting debt to be discharged? How are we to reconcile the availability of discharge to debtors who rely upon floor plan financing against the competing need to ensure the availability of floor plan financing in general? A review of recent cases yields some positive insight into the kinds of circumstances that count for a finding of malice within the meaning of the statute.

The Fifth Circuit in *Perry Chrysler Plymouth* concluded that a debtor's taking floor plan proceeds to Las Vegas in an effort to "enlarge" his capital did not qualify as a just cause or excuse for failing to remit the funds to the creditor, and so was malicious. *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d at 486. The court in *In re Posta* held that the debtor's conduct was not malicious merely because such conduct violated the terms of a security agreement. *In re Posta*, 866 F.2d at 364. The court noted that "malicious intent must be demonstrated by evidence that the debtor had *knowledge* of the creditor's rights and that, *with that knowledge*, proceeded to take action in violation of those rights". *Id.* at 367 (quoting *In re Dever*, 49 B.R. 329, 332 (Bankr.W.D.Ky. 1984)) (emphasis added).

In *In re Clayburn*, the court had little difficulty categorizing debtor's conduct as malicious, where property damage resulting from a car accident in which liquor and drugs were involved, because the debtor had acted with reckless disregard for the rights of the injured party. *In re Clayburn*, 67 B.R. at 522. In *Rebhan*, the court found malice in the breach of a floor plan agreement based upon the creditor's theory that the funds had been converted. *Chrysler Credit Corp. v. Rebhan*, 842 F.2d at 1257. In *In re Cullen*, the court held that malice was shown because the debtor knew that his act would harm another and yet proceeded in the face of such knowledge. *In re Cullen*, 71 B.R. at 274. In *In re Watkins*, the debtors tried to conceal their business transactions and even sought to dissuade the creditor from performing an audit in order to conceal the sale out of trust. *In re Watkins*, 90 B.R. at 849; *see also In re Hendry*, 77 B.R. at 90 (same).

■ Each of these cases points up that "something extra" that demonstrates that the debtor acted without just cause or excuse. Simply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of debtor should not be enough to trigger a finding of malice. If this were the case, then nearly any intentional conduct would fall within this exception to discharge, and the term "malicious" would be effectively read out of the statute. *Posta*, 866 F.2d at 367; *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) (statutes should be construed to give effect to every word Congress used).

Grier's conduct cannot be categorized as malicious. He knew what the agreement required, but his business relationship with AHFC was such that neither he nor AHFC really expected the monies received from the sale of inventory to be immediately remitted to AHFC. AHFC had allowed debtor to "modify" the original payment structure. Its acquiescence encouraged his expectation that the payment term was not critical to the lending relationship. There was no effort at concealment. There was no effort to convert. There were no drugs. There was no gambling. There was only a reasonably held belief that AHFC had acquiesced in Grier's business practice, a circumstance which this court finds qualifies as a "just cause or excuse" for his having failed to remit the proceeds to AHFC as the Security Agreement technically required. *See Seven Elves*, 704 F.2d at 245 ("under section 523(a)(6), the proper focus is not upon the injury but rather the focus is upon the nature of the conduct that gives rise to the injury"); *In re Cohen*, 121 B.R. 267 (Bankr.E.D.N.Y.1990); *In re Hamanaka*, 53 B.R. 320, 323 (Bankr.S.D.N.Y.1985) ("the proper focus in determining whether an exception to discharge is warranted is the nature of the act and not the nature of

the liability").[4] In light of the facts of this case, debtor's conduct cannot be categorized as malicious.

The concern for promoting the availability of floor plan financing is not undercut by this decision. *See* T. Jackson, *The Fresh Start Policy in Bankruptcy, supra.* A discharge under 11 U.S.C. § 523(a)(6) will still not be available to a debtor who affirmatively conceals or converts assets subject to security agreements or who unilaterally subverts floor planning agreements "without just cause or excuse." Floor plan financiers can protect themselves by conducting routine audits on their security and by insisting that the terms of the agreements not be compromised or modified by course of dealings (or similar conduct). Diligent, vigilant creditors will continue to be protected. Lax creditors will not. That result is consistent with the policy goal of balancing the need for credit with the need for discharge.[5]

Bankruptcy courts are inherently courts of equity. It is a well known legal maxim that "[h]e who comes into equity must come with clean hands". D. Dobbs, *Handbook on the Law of Remedies* 45–46 (1973). Grier seeks in equity a discharge of his $15,070.19 deficiency to AHFC. Although Grier's conduct is tainted by his breach, it does not deprive him of clean hands (else bankruptcy's equitable relief would not be available to *any* debtor). It is also said that "the laws aid those who are vigilant, not those who sleep on their rights." Black's Law Dictionary. AHFC slept on its rights here and has little cause to complain that the debtor came to rely on its slumber.

In light of the foregoing, the court finds that, though Grier's conduct was willful, it was not malicious for purposes of Section 523(a)(6). As such, the obligations owed to plaintiff AHFC by the defendant Grier, in the amount of $15,070.19, shall be discharged.

All findings may be construed as conclusions, and vice versa.

Judgment will be entered consistent with this decision.

---

**4.** That the contract itself might contain a "no waiver" clause is of little moment. Our inquiry here is not for "waiver" under contract law, but "just cause or excuse" under bankruptcy law. They are not the same inquiries.

**5.** As a general proposition, nondischargeability provisions are designed to protect vulnerable creditors who would otherwise be at the mercy of unscrupulous, dishonest, reckless, or larcenous debtors. Implicit in the concept of "just cause or excuse" must be the notion that creditors who can easily enough protect themselves from loss hardly need the special protections of the nondischargeability sections. Floor plan financiers as a group are admittedly more vulnerable than other kinds of lenders, but AHFC could have protected itself in this case by simply insisting on compliance with its Security Agreement from the beginning. In failing to do so, it also encouraged lax performance on the part of its debtor. Keeping in mind the balancing of economic needs that lies at the base of our inquiry, it cannot be seriously maintained that AHFC is the sort of creditor whom Congress intended to protect with Section 523(a)(6).