**In re Samuel Louis MAGEE.**

**WICKES LUMBER COMPANY, Plaintiff,**

v.

**Samuel Louis MAGEE d/b/a Sam's Service Co. & Sam's Building Service, Defendant.**

**Bankruptcy No. 9101816EEJ. Adv. No. 9100174.**

United States Bankruptcy Court, S.D. Mississippi, Jackson Division.

Feb. 14, 1994.

---

Ross E. Henley, Jackson, MS, for plaintiff.

Curtis G. Kirby, Jr., Jackson, MS, for defendant.

## MEMORANDUM OPINION

EDWARD ELLINGTON, Chief Judge.

This adversary proceeding is before the Court upon the Order of Remand entered in the United States District Court for the Southern District of Mississippi, Jackson Di-

vision. The Order of Remand was entered pursuant to an appeal filed by Wickes Lumber Company from this Court's Order Dismissing Objection to Discharge and Memorandum Opinion.

Wickes Lumber Company initiated the present adversary proceeding by filing a complaint to determine the dischargeability of its claim against the Defendant, Samuel L. Magee, pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).[1] At the close of the Plaintiff's presentation at trial of evidence supporting its claim of nondischargeability, this Court dismissed the complaint upon the Defendant's motion pursuant to Rule 7041(b) of the Federal Rules of Bankruptcy Procedure.

In rendering its judgment, the Court orally made certain findings of fact and conclusions of law which appear in the record, and in so doing, reserved the right to supplement its findings by way of a written memorandum opinion. A final judgment in the form of an Order Dismissing Objection To Discharge was entered on January 5, 1993. On January 28, 1993, this Court issued a memorandum opinion to supplement the findings of fact and conclusions of law rendered orally at the time of trial.

On appeal to the United States District Court for the Southern District of Mississippi, Jackson Division, the Honorable Henry T. Wingate affirmed this Court's dismissal of Wickes' nondischargeability claims based on Bankruptcy Code §§ 523(a)(2)(A) and 523(a)(4). The district court then remanded the case to this Court for a clarification of the factual findings and legal conclusions upon which the dismissal of Wickes' nondischargeability claim under Bankruptcy Code § 523(a)(6) was based.

1. Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

2. Copies of the following checks executed by Magee and made payable to Wickes in the total amount of $48,080.85 were admitted into evidence at trial:
a. Check dated August 8, 1989 in the amount of $45.32;
b. Check dated September 15, 1989 in the amount of $7,935.95;

## FINDINGS OF FACT

The Plaintiff, Wickes Lumber Company, is a building supply company with a store located in Pearl, Rankin County, Mississippi. The Defendant, Samuel Magee, entered the construction business in 1989, building a total of five small residences for speculative sale prior to his bankruptcy filing in 1991. The construction of each house was financed through a construction loan. During the time that Magee was building houses, he purchased building materials from Wickes.

In April of 1989 Magee executed a credit agreement with Wickes whereby credit was extended for the purchase of materials. At trial, Jerry Geimer, the manager of Wickes at the time of Magee's purchases, testified regarding Wickes' credit approval process. Mr. Geimer testified that in order to obtain a line of credit from Wickes, the customer is required to complete a credit application. A credit check is then run on the applicant, and a recommendation is made by the local store to the corporate office, where the application is ultimately approved or disapproved. Mr. Geimer further testified that when a job is started by a customer, Wickes usually asks whether the job is financed, and if so, "then we check on it." No testimony was given showing a specific course of conduct followed by Wickes when supplying materials on financed projects.

After obtaining a line of credit, Magee purchased from Wickes materials used in the construction of each of his houses. Magee paid Wickes a total of $48,080.85 for all materials purchased prior to September 30, 1990.[2] At trial, Magee testified regarding payments to Wickes as follows:

c. Check dated November 11, 1989 in the amount of $10,753.68;
d. Check dated February 6, 1990 in the amount of $3,671.21;
e. Check dated April 17, 1990 in the amount of $10,434.46;
f. Check dated June 8, 1990 in the amount of $3,237.44;
g. Check dated June 29, 1990 in the amount of $11,849.20, and;
h. Check dated September 11, 1990 in the amount $153.59.

**Q.** .... Now, how—how did you pay Wickes on these houses?

**A.** Paid him—I paid them—I settled with them primarily on the bulk of the purchases when I closed the loans.

**Q.** Right. Okay. Now, even—was it your understanding that the bills, the invoices, were due on the 10th day of the month after they were received?

**A.** Yes.

**Q.** And did you pay them by the 10th day of the month?

**A.** No.

**Q.** What was your agreement with Wickes as to when you would pay those bills?

**A.** I—I told them that I'd have to pay them when—when I could close the deal on the house.

**Q.** Okay.

**A.** And it's—that's—that's what I did on the four that I was able to sell and close.

(Transcript, pp. 78–9).

Between October 3, 1990 and November 17, 1990, Wickes supplied materials to Magee which were incorporated into the fifth and final house which he constructed. Security Savings and Loan Association financed the construction of the house and obtained a valid first deed of trust on the property. During construction of the house, Magee made three draws from the loan proceeds, on October 15, 1990, October 26, 1990 and November 16, 1990. At the time of each draw, Magee executed a form affidavit stating that at the time of execution there were no unsatisfied claims for payment or liens for materials or labor used in the improvement of the property. The last sentence of the affidavit appears as follows:

This affidavit is given to induce Chicago Title Insurance Company to issue title insurance policy or policies.

During the trial Jerry Geimer, Wickes' manager, testified that he was unaware of the existence of the affidavits until the week of the trial which took place on December 18, 1992.

Monthly invoices representing charges for the October and November 1990 purchases used in the construction of the fifth house were received by Magee, but were not paid in accordance with the terms listed on the invoices. Magee admitted during his testimony that he did not pay Wickes from each draw for materials attributable to that draw. He explained that his failure to pay Wickes in accordance with the terms of the invoices was within the usual course of conduct between the parties.

Magee testified that he was ultimately unable to pay Wickes because he was unable to sell the house. On December 21, 1990, Wickes filed a lien notice in the Office of the Chancery Clerk for Hinds County, Mississippi.

In March of 1991 Wickes obtained a default judgment against Magee in the County Court of Rankin County, Mississippi in the amount of $16,847.83. On May 10, 1991 Magee filed his petition for relief under Chapter 7 of the Bankruptcy Code. The automatic stay was subsequently lifted to allow Security Savings and Loan Association, the construction lender, to foreclose on the property.

## CONCLUSIONS OF LAW

In order to obtain a judgment of nondischargeability under § 523 of the Bankruptcy Code, the Plaintiff must prove its case by the preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Additionally, the issue of whether a particular debt is nondischargeable under the Bankruptcy Code is a matter of federal law. *Id.; Allison v. Roberts (Matter of Allison)*, 960 F.2d 481, 483 (5th Cir. 1992).

### § 523(a)(6)

Wickes claims that Magee's actions with respect to Wickes are sufficient to render Wickes' claim nondischargeable under § 523(a)(6), which provides in pertinent part as follows:

11 U.S.C. § 523

## § 523. Exceptions to discharge.

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

"Section 523(a)(6) is based on tort principles rather than contract. It is designed to compensate the injured party for the injury suffered while not allowing the debtor to escape liability for a 'willfull [sic] and malicious' injury by resort to the bankruptcy laws." *Friendly Finance Service v. Modicue (In re Modicue)*, 926 F.2d 452, 453 (5th Cir.1991) (citations omitted). Thus § 523(a)(6) does not except from discharge damages arising out of a breach of contract, but instead excepts from discharge only those damages to another or the property of another that are caused by willful and malicious conduct. *Id.* at 453.

Wickes claims that Magee's actions in executing the false affidavits and failing to use the construction proceeds to pay Wickes for materials attributable to each draw constituted willful and malicious conduct by Magee within the meaning of § 523(a)(6).[3]

The controlling standard adopted by the Fifth Circuit Court of Appeals for determining whether Magee's conduct was "willful and malicious" within the meaning of § 523(a)(6) is as follows:

In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury of an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive [sic], even in the absence of personal hatred, spite or ill-will. The word 'willful' means 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury. *Therefore, a wrongful act done intentionally,*

*which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.*

*Kelt v. Quezada (Matter of Quezada)*, 718 F.2d 121, 123 (5th Cir.1983) *cert. denied*, 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984) (citing 3 *Collier on Bankruptcy*, 523.16 at 523–128 (15th ed. 1983) (emphasis added). *See also Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983); *Petty v. Dardar (Matter of Dardar)*, 620 F.2d 39, 40 (5th Cir.1980); *Vickers v. Home Indemnity Co.*, 546 F.2d 1149, 1150 (5th Cir.1977); *Federal Deposit Insurance Corp. v. Lefeve (In re Lefeve)*, 131 B.R. 588, 602 (Bankr.S.D.Miss. 1991); *Guaranty Corp. v. Fondren (In re Fondren)*, 119 B.R. 101, 105 (Bankr. S.D.Miss.1990); *Meridian Production Ass'n v. Hendry (In re Hendry)*, 77 B.R. 85 (Bankr.S.D.Miss.1987); *Berry v. McLemore (In re McLemore)*, 94 B.R. 903, 906 (Bankr. N.D.Miss.1988).

In its Memorandum Opinion dated January 28, 1993, this Court held that Magee's actions were both intentional and deliberate, and therefore, were willful. No evidence was offered showing that Magee was unaware that he had signed the affidavits, or that he was unaware that he owed Wickes for materials supplied.

This Court also held that Magee's actions did not amount to malicious conduct, and therefore, Wickes' claim of nondischargeability under § 523(a)(6) must fail. In its Order of Remand, the district court directed this Court to clarify its holding that Magee's actions were not also malicious within the meaning of § 523(a)(6).

■ In accordance with Fifth Circuit precedent, in order for the execution of the affidavits to amount to willful and malicious conduct, the act must not only be done intentionally, but also the act must be one which

---

**3.** Wickes' brief submitted on appeal to the district court states:

"Thus, for Magee's debt to Wickes to be nondischargeable his conduct must have: (1) been deliberate or intentional, (2) produced injury to Wickes or Wickes' property interest and (3) been wrongful and without just cause or excuse. The destruction of Wickes' materialman's lien through the execution of knowing-

ly false affidavits by Magee to obtain the construction loan proceeds and the subsequent misappropriation by Magee of the construction funds by failing to use said funds to pay for the materials used to build the house, clearly meets each of these elements."

Brief of Appellant, p. 7, *Wickes* (No. J93–0052 (W)(N)).

necessarily produces harm *and* is without just cause or excuse. *See Kelt v. Quezada (Matter of Quezada)*, 718 F.2d 121, 123 (5th Cir.1983) *cert. denied*, 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983); *Petty v. Dardar (Matter of Dardar)*, 620 F.2d 39, 40 (5th Cir.1980); *Vickers v. Home Indemnity Co.*, 546 F.2d 1149, 1150 (5th Cir.1977).

While the Fifth Circuit has clearly stated the elements of a willful and malicious injury, these elements are not easily applied to the facts in the present case since the alleged wrongful acts in each of the Fifth Circuit cases are generally of a type where malice can be inferred more readily. *See Kelt v. Quezada (Matter of Quezada)*, 718 F.2d 121, 123 (5th Cir.1983) *cert. denied*, 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984) (injury resulting from debtor's harboring of pit bulldog held dischargeable); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983) (injury allegedly resulting from the malicious prosecution of an involuntary bankruptcy); *Petty v. Dardar (Matter of Dardar)*, 620 F.2d 39, 40 (5th Cir.1980) (injury resulting from debtor beating plaintiff following an automobile accident); *Vickers v. Home Indemnity Co.*, 546 F.2d 1149, 1150 (5th Cir. 1977) (injury resulting from stabbing committed by debtor).

However, in a case that is more factually similar, the Ninth Circuit Court of Appeals upheld the Bankruptcy Appellate Panel's construction of the phrase "necessarily produces harm," where "[t]he BAP read 'the words 'necessarily produces harm' to mean that the act must be targeted at the creditor, *at least in the sense that the act is certain or almost certain to cause financial harm.*' *Id.* at 638 (emphasis added)." *Transamerica Commercial Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir.1991) (citing *Borg–Warner Acceptance Corp. v. Littleton (In re Littleton)*, 106 B.R. 632, 638 (Bankr. 9th Cir.1989). The Ninth Circuit went on to explain that "an act is targeted at the creditor, if the predictable result of the debtors' intentional act would almost certainly be harmful to the creditor." *Id.* at 555.

The *Littleton* case involved a § 523(a)(6) action by Transamerica Commercial Finance Corporation against the debtors, officers and shareholders of an appliance business known as "Jacob's." Pursuant to an inventory security agreement, Transamerica provided inventory financing to the debtors. The security agreement granted a security interest in both inventory and proceeds from the sale of inventory, and required that cash proceeds be held in a segregated account. The debtors never established a segregated account, but instead paid Transamerica by checks drawn on a general business account, which Transamerica accepted.

Under the terms of the security agreement, the debtors were to report inventory sales and to remit the cost of inventory sold on a weekly basis. The security agreement also required the debtors to submit to monthly inventory inspections and to pay Transamerica the cost of any item of inventory not found on the premises. Upon inspection, it was determined that inventory had been sold that had not been reported. Jacob's and its officers subsequently filed bankruptcy petitions. On the date of the Jacob's bankruptcy filing, the balance due Transamerica was approximately $70,000.

In upholding the BAP's affirmance of the bankruptcy court's conclusion that the debtors' actions were not malicious, the Ninth Circuit stated:

The bankruptcy court concluded that the methods by which Jacob's made payments and handled inventory did not constitute acts that necessarily produced harm. Furthermore, the bankruptcy court found that at all times the debtors were acting with the hope and expectation of saving the business and that they cooperated with Transamerica by seeking additional financing that would allow Jacob's to stay in business. Additionally, the debtors offered a third trust deed on their residence as additional security for the loan. Moreover, there was no evidence that the debtors used any of the proceeds for their personal benefit, or that any other creditor was paid other than in the ordinary course of business in the month before insolvency proceedings were filed.

Considering these facts, it was not clearly erroneous for the bankruptcy court or the BAP to conclude that the debtors' acts would not have necessarily produced harm. Consequently, the debtors' conduct was not malicious, as that term is used in § 523(a)(6).

*Id.* at 555.

In the present case, testimony from Magee was received at trial regarding the course of conduct between Magee and Wickes. Magee testified that even though the credit agreement stated that he would be billed monthly with payment due by the tenth of each month, he did not ordinarily pay according to the terms of the agreement. Wickes' manager testified that while customers are billed once a month with payment due by the tenth of each month, Wickes will usually continue to ship materials to a customer until the account becomes sixty days overdue.

Magee further testified that upon making a draw or upon closing the sale of a house, he would sometimes use the proceeds to pay Wickes to date on more than one project. He also testified that the course of conduct between Wickes and himself on the final house was not unusual except that he was unable to sell the house, resulting in a foreclosure by Security Savings. Prior to his failure to sell his final house, Magee had paid Wickes in full for all materials incorporated into his four other houses while operating under the same business practices used on his fifth and final house.

This Court concludes that Magee's actions did not necessarily produce harm to Wickes in light of the evidence presented regarding the parties' past course of conduct. In fact, prior to his inability to sell his final house, Magee managed to pay Wickes in excess of $48,000 for materials purchased using the same arrangement for payment on account.

Additionally, it is this Court's opinion that Magee's actions were not without "just cause or excuse" as the phrase is used in reference to § 523(a)(6). This is not to say that Magee's methods of satisfying the claims of laborers and materialmen were correct. However, this Court does not construe the phrase "just cause or excuse" to mean

that Magee had to exercise sound business judgment in all respects in order to escape a judgment of nondischargeability under § 523(a)(6).

In discussing the meaning of the phrase "willful and malicious injury" in a case where an automobile dealer sold an automobile in violation of a security agreement by failing to obtain written consent for the sale, and further failed to remit the sale proceeds to the secured party, the United States Supreme Court stated:

> The respondent contends that the petitioner was liable for a willful and malicious injury to the property of another as the result of the sale and conversion of the car in his possession. There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception.... But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 331–32, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) (citations omitted).

Testimony was presented at trial that Magee's intended method of paying Wickes on his final house was no different than the method used on the other four houses built by Magee. This method of payment was acceptable to Wickes until it did not get paid as a result of Magee's inability to sell his final house. It is this Court's opinion that the acceptability to Wickes of the parties' past course of conduct on Magee's four previous projects, coupled with the parties' intention to operate in accordance with their ordinary course of conduct on the final project is sufficient to constitute "just cause or excuse" as contemplated by § 523(a)(6).

In support of its position Wickes relies on two cases, *Cheek v. Lowe's of Georgia (In re*

*Cheek),* 17 B.R. 875 (Bankr.M.D.Ga.1982) and *Vessel v. La Brant (In re La Brant),* 23 B.R. 367 (Bankr.N.D.Ill.1982).

*In re Cheek,* which is based on Georgia law, involved a debtor's execution of a knowingly false statutory affidavit upon completing construction of a house. Pursuant to a Georgia statute [4], the affidavit, stating that all claims of laborers and materialmen had been paid, had the effect of dissolving all construction liens on the property. In holding that the debt was nondischargeable pursuant to § 523(a)(6), the court found that the destruction of a perfected lien by use of a false statutory affidavit amounted to injury to property within § 523(a)(6), and further, that where the debtor knew the effect of the false statutory affidavit, the intentional destroying of a lien amounted to a wrongful and malicious act. The court also noted that the debtor could be subject to criminal liability for his actions.

Although in the *Cheek* case the court found the debtor's actions to be malicious, this Court does not believe that the facts in the *Cheek* case are analogous to the facts in the present case. The evidence presented at trial shows that Magee and Wickes had an established course of conduct, and that Magee's allegedly malicious actions were in accordance with this course of conduct. Furthermore, the court's ruling in the *Cheek* case is not binding on this court.

Additionally, Mississippi has no similar statute whereby a *perfected* lien can be destroyed by an affidavit. Wickes's lien for materials supplied to Magee arose under Miss.Code Ann. § 85–7–131 (1972), which provides in pertinent part as follows:

§ 85–7–131. **Property subject to lien; effect as to purchasers, etc., without notice.**

Every house, building . . . shall be liable for the debt contracted and owing, for labor done or materials furnished, or archi-

tectural engineers' and surveyors' or contractors' service rendered about the erection, construction, alteration or repairs thereof; and debt for such services or construction shall be a lien thereon. The architects, engineers, surveyors, laborers, and materialmen and/or contractors who rendered services and constructed the improvements shall have a lien therefor.

. . . . *Such lien shall take effect as to purchasers or encumbrancers for a valuable consideration without notice thereof, only from the time of commencing suit to enforce the lien, or from the time of filing the contract under which the lien arose, or notice thereof, in the office of the clerk of the chancery court, as hereinafter stated. . . .*

(emphasis added).

On December 21, 1990, Wickes perfected its lien for materials supplied from October 3 through November 17, 1990 by filing a lien notice in the Office of the Chancery Clerk for Hinds County, Mississippi. At the time Wickes perfected its lien, the proceeds from the construction loan had been fully disbursed. Had Wickes perfected it's lien prior to the disbursement of the loan proceeds, then Wickes' lien would have had priority over subsequent loan disbursements regardless of the execution of the affidavits. Additionally, if Magee had been successful in selling the house, Wickes' perfected lien would have entitled it to participate in the sale proceeds ahead of the Debtor at the time of the sale closing.

*Vessel v. La Brant (In re La Brant),* 23 B.R. 367 (Bankr.N.D.Ill.1982), the second case upon which Wickes relies, involved a complaint under §§ 523(a)(2)(A) and 523(a)(6) to determine the dischargeability of a debt where the debtor, a contractor, persuaded the plaintiff, a subcontractor, not to perfect a mechanic's lien on the property in

---

4. The court in *In re Cheek* explained the effect of the Georgia statute as follows:

Ga.Code Ann. § 67–2001 provides that materialmen such as Lowe's have a "special lien" on the real estate. Also, this Code section provides that a sworn statement of the contractor shall operate to dissolve all liens given by this section. Ga.Code Ann. § 67–2002 re-

quires the filing of the lien within three months after the material is furnished. Lowe's did all that it was required to do. These Code sections then give a "special lien," provide a method to make good the lien, but they also provide a method for the contractor (Cheek) to dissolve the lien.

*In re Cheek,* 17 B.R. at 877–78.

question. Stating that a perfected lien would only delay closing of the sale, the contractor promised payment upon closing if the subcontractor would forbear filing notice of the lien. Based on the contractor's promise, the subcontractor delayed filing notice of the lien. At the sale closing the contractor assured the owners and the closing officer that the subcontractor would be paid from the closing proceeds. However, upon receipt of the loan proceeds, he failed to pay the subcontractor.

In finding the debt nondischargeable under § 523(a)(6), the court stated that the "Defendant engaged in a course of activities to hinder and delay the collection of the debt by making false representations to the Defendant and the purchasers of the home, and but for Defendant's fraud Plaintiff could have filed a timely mechanic's lien and protected her interest." *In re La Brant*, 23 B.R. 367, 369–70.

The malicious act in *La Brant* was the contractor's false promise to pay the subcontractor at closing if she would forebear filing a notice of lien. But for the contractor's false promise, the subcontractor would have possessed a perfected lien on the property. In the present case, no evidence was introduced to show that Magee persuaded Wickes not to avail itself of its rights under Mississippi law.

In addition to inducing the subcontractor not to perfect her lien, in the *La Brant* case, the contractor received the final sale proceeds from which he had promised to pay the subcontractor but failed to pay them over to her. In the present case, the evidence shows that Magee represented that he would bring his account current when he sold the house, as he had on the past four projects. Unlike La Brant, Magee did not sell the house, and therefore was unable to bring his account with Wickes current.

## CONCLUSION

In summary, Wickes alleges that its claim against Magee should be adjudged nondischargeable pursuant to § 523(a)(6) as a result of willful and malicious injury by Magee to the property of Wickes. Specifically, Wickes asserts that Magee's actions in exe-

cuting the affidavits and in failing to pay Wickes from each construction draw amount to willful and malicious conduct as contemplated by § 523(a)(6).

In its previous order and memorandum opinion, this Court found that Magee's actions were willful. This Court is still of the opinion that Magee's actions were willful in the sense that they were intentionally done. However, this Court is of the opinion that Magee's actions were not malicious, nor were they the type of acts which would necessarily produce harm.

The evidence presented at trial shows that the Magee and Wickes engaged in the same course of conduct on four separate occasions without any harm to Wickes, and that Wickes was paid each time, receiving a total amount in excess of $48,000. The Court finds that it was the intention of the Debtor to once again pay Wickes at the time the fifth house sold. Unfortunately the house did not sell in a timely manner, to the detriment of both parties.

Based on the foregoing, the opinion of this Court is that Wickes has failed to meet its burden of proof under § 523(a)(6) of the Bankruptcy Code, and therefore, its complaint should be dismissed. In accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure, a separate judgment will be entered consistent with this opinion.

## FINAL JUDGMENT

Consistent with this Court's opinion dated contemporaneously herewith, it is hereby ordered and adjudged that the Complaint of Wickes Lumber Company is dismissed with prejudice.

This is a final judgment for the purposes of Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

### ORDERED AND ADJUDGED.