In re Daniel W. BROUILLET and
Peggy Brouillet, Debtors.

MERCHANTS NATIONAL
BANK, Plaintiff,

v.

Daniel W. BROUILLET and Peggy
Brouillet, Defendants.

Bankruptcy No. 89–41160–JFQ.
Adv. No. 90–4020.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 22, 1991.

Herbert Weinberg, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for Merchants Nat. Bank, plaintiff.

Russell S. Chernin, Worcester, Mass., for debtors/defendants.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

The Debtors, Daniel W. Brouillet and Peggy Brouillet, used proceeds of accounts receivable to pay business debts other than the debt due Merchants National Bank (the "Bank") which held a security interest in the proceeds. The Bank says that this was "willful and malicious injury ... to ... [its] property" within the meaning of 11 U.S.C. § 523(a)(6) (1988), so that its debt should not be discharged in these proceedings. I hold that what the Debtors did was not "malicious" under the statute.

## I. FACTS

Daniel W. Brouillet, a sole proprietor, operated a construction business known as Central Mass Drywall ("Central Mass"). His wife took care of the finances. Their loan arrangement with the Bank, which was secured primarily by accounts receivable, had a limit of $350,000 and was based upon a formula which restricted advances to eighty percent of current accounts receivable plus ten percent of contracts in progress. The Bank made advances periodically as requested by the Debtors, billing interest monthly. Under the parties' arrangement, Mrs. Brouillet would deposit receivable proceeds in the Central Mass general account at the Bank; within a day or two thereafter she would deliver a check to the Bank drawn on this account for ninety percent of the recent deposit. Occasionally, the Bank would pay itself from a deposit by debiting the account and crediting the loan indebtedness.

The business began to slide downhill during 1989 due to the collapse of the local housing market. The Bank hired a "work-out" consultant to monitor this and other troubled loans. He helped Central Mass with its record keeping, and he prepared weekly reports. On October 16, 1989 the Bank covered a $4,087.42 overdraft. It advanced $24,000 on October 18th and $11,000 on October 26th, knowing that the loan was then over the formula amount. It also received some payments on the debt during this period.

On Friday, October 27th, Mrs. Brouillet met with the president of the Bank, two loan officers, and the Bank's "work-out" consultant. The parties discussed the status of accounts receivable in relation to the loan balance, which exceeded the formula amount. The largest receivable was then an amount currently due from Blaine & Henderson Construction Consultants, Inc. The meeting was essentially an informational one; it involved no decision on the part of either the Bank or the Debtors. The Debtors had no plan at that time to close the business, nor had the Bank declared a default on the loan.

After the close of the meeting, Mrs. Brouillet spoke with Betsy Samuels, one of the loan officers, to express her concern with her ability to make next week's payroll and pay other current bills. She asked Ms. Samuels whether advances would be available if the Blaine & Henderson receivable was not paid by the end of the week. Ms. Samuels told her that the Bank was

evaluating the entire situation, and that she could give no definite answer. Mrs. Brouillet telephoned Ms. Samuels on the following Wednesday and again on Friday, November 3rd, to ask the same question. Ms. Samuels gave Mrs. Brouillet the same response on each occasion—that she was unable to give any definite answer, in part because the loan officer in charge of the account was away from the Bank at a seminar.

Mrs. Brouillet concluded, after this last conversation, that even if the Blaine & Henderson receivable were collected and ninety percent of the collection paid on the loan, the Bank would probably not advance sufficient funds to pay the bills. She and Mr. Brouillet consulted a lawyer, and were advised of the importance of paying taxes in order to satisfy their personal liability.

On Monday, November 6th, Mrs. Brouillet received two checks in partial payment of the Blaine & Henderson account, one for $17,000 and the other for $83,677. She and Mr. Brouillet decided to use the funds to pay final bills and close the business. They opened an account at another bank and deposited the money there. They did this because they believed that a deposit with the Bank would require a ninety percent payment on the loan, and that the Bank would make no further advances. From these funds Mrs. Brouillet paid three weeks' payroll, totaling almost $50,000, payroll taxes amounting to $5,000 and bills owed subcontractors of about $45,000. This left $2,945.05, which Mrs. Brouillet paid to the Bank. The Debtors closed the business on November 9th.

The Bank's security interest extended to the Blaine & Henderson checks as proceeds of the Bank's security interest in receivables. Mass.Gen.L. ch. 106, §§ 9–203, 9–306. Mrs. Brouillet knew that the Bank's collateral included receivables as well as other business assets and the Debtors' home. Her understanding of the nature of the Bank's interest in customer payments, however, did not go beyond a recognition that Central Mass was contractually obligated to deposit these payments with the Bank. It is nevertheless clear that she (and Mr. Brouillet) intentionally breached their contract with the Bank.

## II. DISCHARGEABILITY OF BANK'S DEBT

There is no dispute that the Debtors' use of the Blaine & Henderson proceeds was unauthorized by the Bank, or that this use was "injury to property" within the meaning of § 523(a)(6). The issue is whether the Debtors' conduct was "willful and malicious."

■ Legislative history confirms that the element of "willful" requires that the conduct be deliberate or intentional.[1] Principles of tort law provide guidelines. Intent in tort law means that the actor either desires to cause the consequences of his act or believes that the consequences are substantially certain to result from it. *Restatement (Second) of Torts* § 8A (1965). The Debtors both desired the consequences of their action and knew that these consequences were certain to follow. It seems clear that they converted the Bank's property. *See Restatement (Second) of Torts* § 222A (1965). But was that conversion "malicious"?

The Bank says that § 523(a)(6) requires only an intentional or deliberate act which is wrongful, without just cause or excuse, and which necessarily causes the injury to its property interest, even though there is no personal hatred, spite or ill will directed at the Bank or its property. As authority for this proposition, it cites *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1985), which in turn relied upon *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1903). *Tinker* involved the question of whether a judgment debt for damages arising from "criminal conversation" of the debtor with the judgment

---

1. Legislative history declares:
   Under this paragraph, 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 139 [sic] [193] U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754 (1904)] ... held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled. H.R.Rep. No. 595, 95th Cong., 1st Sess. 365.

creditor's wife was dischargeable under § 17(2) of the Bankruptcy Act of 1898. That statute, essentially the same as § 523(a), excepted from discharge debts "for willful and malicious injuries to the person or property of another." *Tinker* held the debt nondischargeable, stating that "special malice towards the individual personally" was not necessary. *Tinker* at 487–88, 24 S.Ct. at 509. The court observed that the injury involved in the case before it "is one of the grossest which can be inflicted upon the husband, and the person who perpetrates it knows that it is an offense of the most aggravated character; that it is an injury for which no adequate compensation can be made, and hence personal and particular malice towards the husband as an individual need not be shown, for the law implies that there must be malice in the very act itself." *Tinker* at 485, 24 S.Ct. at 508. The court in *Tinker* recognized that it was unnecessary "to hold that every willful act which is wrong implies malice." *Tinker* at 489, 24 S.Ct. at 510.

The Debtors' conduct here is obviously far different from invasion of the marital relationship involved in *Tinker*. *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) comes closer to home. There, an automobile dealer financed the purchase of cars for his inventory, signing a chattel mortgage and trust receipt covering the vehicles. The dealer's agreement with the lender required that upon the sale of a vehicle he would pay the lender the amount due from the vehicle's purchase. The dealer sold a vehicle, notified the lender of the sale, and promised payment but never paid. Recognizing that a conversion had taken place by reason of the dealer's failure to account for the sales proceeds, the court stated:

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the exception ... But a wil[l]ful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wil[l]fulness or malice.

*Davis* at 332, 55 S.Ct. at 153.

The court then turned to the finding of the trial court that "the defendant in this case was not actuated by willful, malicious or criminal intent in disposing of the car in question." *Davis* at 332, 55 S.Ct. at 153. The court regarded this finding as conclusive in establishing a "conversion without aggravated features." *Davis* at 333, 55 S.Ct. at 153.

■ I find that the Debtors' conduct was not malicious because here too the conversion was without aggravated features. This is due in part to the Debtors' lack of understanding concerning the existence of the Bank's property interest in proceeds. The Debtors, moreover, felt a greater moral responsibility to pay employees and subcontractors than to pay the Bank. They knew that these individuals were depending upon the funds for their livelihood. True, the Debtors also wished to satisfy their own tax obligations, but their tax debt was relatively minor. Unlike the situation present in *Tinker*, the Debtors' conduct, viewed as a whole, is not so inherently egregious as to imply the necessary malice. The circumstances in *St. Paul Fire & Marine Ins. Co. v. Vaughn, supra*, were quite different. The debtor there spent the creditor's money on personal rather than business expenses, purchasing a sports car, an historic residence, a restaurant, antiques and investment real estate. I would have no trouble inferring the required malice from this conduct.

In sum, the word "malicious" in § 523(a)(6) requires some judgment on the part of the fact finder concerning the degree of immorality of a debtor's conduct. Otherwise, Congress would have specified only that the conduct be "willful." Although not professing to render a moral judgment, the court in *Vaughn* clearly did so when it concluded that the debtor acted maliciously in using the lender's collateral proceeds for extravagant personal items. In another case involving conversion of collateral proceeds, *In re Long*, 774 F.2d 875 (8th Cir.1985), the court ruled that the con-

duct of the debtor was unintentional because of the debtor's "hope" that the lender could be induced to finance his business in chapter 11 despite the debtor's conversion of the lender's proceeds. Because harm was likely to come to the bank, the debtor's conduct in *Long* was intentional under § 8A of the *Restatement of Torts,* which the court purported to follow, the actor's desire or belief must meet an objective standard of reasonableness. What the court obviously concluded, however, was that the debtor's conduct was not seriously culpable because his efforts were directed primarily toward reorganizing his business rather than harming the lender. Such decisions confirm Jerome Frank's conclusion that "formal law frequently conceals what judges do in fact and what makes them do it." Frank, *What Courts Do In Fact,* 26 Ill.L.Rev. 645, 662 (1932).

In the present case, the Debtors' primary motivation was to avoid harm to other creditors rather than to damage the Bank. That is not malicious.

A separate judgment has issued dismissing the complaint.