**In re James A. & Melinda B. PATTON, Debtors.**

**RAI CREDIT CORPORATION, Plaintiff,**

v.

**James A. PATTON, Defendant.**

**Bankruptcy No. 90–51918–C.
Adv. No. 90–5258–C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

June 28, 1991.

---

Lawrence A. Beck, San Antonio, Tex., for James A. Patton.

Teresa Wineland, Shackleford, Shackleford & Phillips, El Dorado, Ark., for RAI Credit Corporation.

ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, OR ALTERNATIVELY FOR NEW TRIAL

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the motion of Plaintiff to alter or amend judgment and findings of fact and conclusions of law, or alternatively for new trial. Upon consideration thereof, the court finds and concludes that the motion should be DENIED.

## BACKGROUND FACTS

The debtor was the principal shareholder of The Gold Mine, Inc. of Camden (The Gold Mine), an Arkansas corporation which operated a jewelry store in Camden, Arkansas. For a period of time the corporation also operated a jewelry store in Hope, Arkansas, known as Becherer's, which was closed in 1988. The debtor was the president, director and chief operating officer of The Gold Mine, while Therral Story, the other shareholder, was a passive investor.

On September 1, 1987, Becherer's Jewelry, Inc., and The Gold Mine, Inc., through their president, James Patton, entered into an agreement for the purchase and sale of retail charge accounts and charge sales with RAI Credit Corporation (RAI). Under this agreement, The Gold Mine was authorized to receive, review and approve credit applications from customers desiring to purchase merchandise on a credit basis, and RAI would purchase the charge accounts. The Gold Mine warranted that all sales represented by the charge accounts were sales of merchantable goods, that the balances were true, and that there were no defenses, credits, setoffs, deductions or counterclaims, and that the charge accounts were genuine, valid, and subsisting. The Gold Mine agreed to indemnify RAI for any loss sustained by RAI in the event of any breach of the warranty.

RAI purchased the charge accounts with full recourse against The Gold Mine, who was responsible for reimbursing RAI for any losses sustained by customer defaults. Accounts determined by RAI to be uncollectible were to be immediately reimbursed by The Gold Mine to RAI. All payments collected on the charge accounts owned by RAI were to be promptly forwarded to RAI with a check covering the total collections at least weekly. Payments received by The Gold Mine were designated in the agreement as trust funds belonging to RAI. The Gold Mine was permitted to commingle these funds with its own funds, but was required to remit a sum equal to the collections received by it at least weekly. The Gold Mine was permitted to accept returns of merchandise and to credit the account of the customer, but was obligated to advise RAI of such credit at least weekly. RAI could deduct the amounts so credited from other monies due from RAI to The Gold Mine, and if there were no monies due from RAI to The Gold Mine, then The Gold Mine was obligated to pay the amount of the credit returns to RAI. The Gold Mine went out of business in December 1989.

The jewelry store was not profitable, and over the course of the five years it was in business, Therral Story, had invested $1.2 million in the business. About September 1, 1989, Story entered into an agreement with James Patton under which Patton would purchase Story's interest for $215,-000.00, payable in equal weekly installments of $10,000.00 each. The Gold Mine guarantied this obligation, and pledged its assets as security for the note executed by Patton to Story. From September to December 1989, $159,500.00 was paid to Story under the stock purchase agreement from The Gold Mine. In addition, The Gold Mine paid a $36,169.86 note balance at the Merchants & Planters Bank of Camden, Arkansas, which was an obligation assumed by Therral Story under the stock purchase agreement.

To fund the stock purchase agreement and keep the jewelry store in business, Patton began to conceal from RAI payments made by customers on charge accounts which had been sold to RAI. Instead of reporting these collections and forwarding them to RAI as required, these payments would not be listed on the daily payment reports, and were used for other purposes. In addition, Patton submitted

certain accounts for purchase by RAI which in fact were not qualifying retail charge accounts. In still other instances, Patton failed to report customer returns of merchandise for credit on their accounts, so that RAI was not reimbursed as required under the contract.

RAI continued to do business with Patton and The Gold Mine, however, purchasing accounts on a regular basis, actually visiting the store only twice and failing to audit the credits in accordance with its own operating procedures. A representative of RAI came to visit the store in October of 1989, the first such visit in over a year. Two months later, at the end of December 1989, The Gold Mine went out of business. Shortly thereafter, in January of 1990, a Chapter 7 bankruptcy petition was filed by The Gold Mine, Inc., aka Becherer's in the United States Bankruptcy Court for the Western District of Arkansas, El Dorado Division. Ron Deri, representative of RAI, met with James Patton after the store went out of business. At that time, James Patton voluntarily furnished a hand-written list prepared by him of accounts which had been paid and the payments diverted, or on which the merchandise had been returned for credit. The account balances as shown on that list totalled $96,361.77.

RAI continued to purchase accounts even after irregularities were discovered in the fall of 1989. In fact it purchased accounts as late as December 1989.

After a trial on the merits, the court ruled in favor of Patton, concluding that RAI had failed to establish nondischargeability under subsections (a)(2) or (a)(4).[1] The court first concluded that Patton lacked any specific intent to defraud and that, in any event, RAI's reliance under the circumstances of this case was not reasonable, so that nondischargeability under Section 523(a)(2) had not been established. The court next ruled that any action against Patton individually could not stand under Section 523(a)(4), unless RAI could establish that the corporate veil of the jew-

elry company should be pierced, and that the evidence failed to sustain such a finding or ruling. The court further failed to find any fiduciary duty running directly from Patton to RAI, obviating a finding of nondischargeability premised on "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).

RAI then filed this motion to alter or amend, or for new trial, arguing, *inter alia,* that the evidence would sustain a finding of nondischargeability under the larceny or embezzlement provisions of Section 523(a)(4). RAI also asked the court to reexamine its evidentiary findings and render ruling in its favor on its remaining contentions under Sections 523(a)(2) and (a)(4).

## ANALYSIS

The contention that the evidence supports a finding of embezzlement or larceny adequate to support a finding of nondischargeability under Section 523(a)(4) is not supported by the record.

■ "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or in whose hands it has lawfully come." *First National Bank of Midlothian v. Harrell (In re Harrell),* 94 B.R. 86, 90 (Bankr.W.D.Tex.1988). The elements to be proven to make out a case of embezzlement are: 1.) appropriation of funds by the debtor; 2.) for the debtor's use or benefit and 3.) *with fraudulent intent. First National Bank of Midlothian,* 94 B.R. at 91 (emphasis added); *Brown v. Beckett (In re Beckett),* 96 B.R. 366, 368 (Bankr.M.D.Fla. 1989).

■ Larceny is defined as "the *fraudulent* and wrongful taking and carrying away of the property of another with *intent to convert* it to the taker's use and with *intent to permanently deprive* the owner of such property." *First National Bank of Midlothian,* 94 B.R. at 90 (emphasis added); *see also Coleman v. Choisnard*

---

**1.** RAI did not plead a cause of action under Section 523(a)(6) for willful and malicious misconduct. *See American Honda Finance Co. v.*

*Grier (In re Grier),* 124 B.R. 229 (Bankr. W.D.Tex.1991).

*(In re Choisnard)*, 98 B.R. 37, 41 (Bankr. N.D.Okla.1989). Further, larceny does not differ from embezzlement except with respect to the manner in which the funds or property come into the possession of a party. *Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 594 (Bankr.E.D.N.Y.1983). Whether a debtor unlawfully appropriated the property at the outset (larceny) or unlawfully appropriated the property after it was entrusted to his care (embezzlement), Section 523(a)(4) requires the fraudulent appropriation of another's property under either course of conduct. *See Burlington Industries, Inc. v. Wilson (In re Wilson)*, 114 B.R. 249, 252 (Bankr.E.D.Cal.1990); *First National Bank of Midlothian*, 94 B.R. at 90, 91; *Toledo Blade Co. v. Shinew (In re Shinew)*, 33 B.R. 588, 592 (Bankr.N.D. Ohio 1983).

■ On the record, no property was entrusted to the individual debtor, James Patton, by RAI Credit, nor did funds lawfully come into the possession of James Patton, individually. Additionally, the court found no showing that the debtor, James Patton, intended to defraud RAI or permanently deprive RAI of its proceeds. Absent a showing of specific intent to defraud or permanently deprive RAI of its proceeds, debtor's conduct did not rise to the level of either embezzlement or larceny required to render the debt nondischargeable. *Burlington Industries, Inc.*, 114 B.R. at 252.

Also, both larceny and embezzlement require a showing that the funds or property were taken for the debtor's use or benefit. *First National Bank of Midlothian*, 94 B.R. at 90, 91. The record reveals no evidence as to whether the monies in question were taken for the individual debtor's use or benefit overall, rather than for the benefit of the corporation with whom RAI had a contract. *See Brown*, 96 B.R. at 368. Absent a showing that the funds were taken for the debtor's own use or benefit overall, the record fails to sustain a charge of larceny or embezzlement. *See id.* Thus, even assuming the evidence would support entrustment of lawful possession in the hands of the corporate entity with whom RAI Credit did business, that finding is not sufficient to support a finding of nondischargeability as to James Patton individually. *Id.* The charge of larceny or embezzlement as to James Patton, individually, must therefore be rejected and with it the premise that he is either indebted to RAI Credit by virtue thereof or that such debt is nondischargeable under Section 523(a)(4).

■ Plaintiff confuses tortious acts by the individual (giving rise to liability under Section 523(a)(6)) with the acts of an individual as an officer of a corporation, itself charged with acting tortiously toward the creditor. In the latter situation, there must be either showing of fraud or defalcation while acting in a fiduciary capacity or a piercing of the corporate veil. *See Boyle v. Abilene Lumber, Inc. (Matter of Boyle)*, 819 F.2d 583, 587–88 (5th Cir.1987) (recognizing that the latter debt discharge exception was intended to reach those debts incurred through debtor's active misconduct and abuses of fiduciary positions that deprived others of their property by criminal acts); *Murphy & Robinson Investment Co. v. Cross (Matter of Cross)*, 666 F.2d 873, 879–80 (5th Cir.1982) (emphasizing that an officer's mismanagement of his corporation alone will not give rise to a Title 11 defalcation); *San Saba Pecan, Inc. v. Failing, II (In re Failing)*, 124 B.R. 340, 344 (W.D.Okla.1989) (holding that the Section 523(a)(4) defalcation exception applies to corporate officers who directly participate in a fraud or defalcation of a creditor even if the corporation rather than the individual officer is the actual fiduciary under the contract or statute that establishes the trust relationship).

■ Under Section 523, a debt is excepted from discharge if the debt resulted from "fraud or defalcation while acting as a fiduciary." 11 U.S.C. § 523(a)(4). Defalcation is defined as a "willful neglect of duty ..." and does not require intentional conduct. *Moreno v. Ashworth (Matter of Moreno)*, 892 F.2d 417, 421 (5th Cir.1990); *see also Advance–United Expressways, Inc. v. Wines (In re Wines )*, 112 B.R. 44, 45 (Bankr.S.D.Fla.1990). In order to ex-

cept a debt from discharge under 11 U.S.C. § 523(a)(4), a court must find that a fiduciary relationship existed and that a defalcation occurred. *Advance–United Expressways, Inc.*, 112 B.R. at 45. Further, the fiduciary duties must be based on an express or technical trust which existed *prior* to the act creating the debt and *without* reference to a wrongful act. *Advance–United Expressways, Inc.*, 112 B.R. at 45–46 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 [1934]; *Reed v. Angelle (Matter of Angelle)*, 610 F.2d 1335, 1338 [5th Cir. 1980]) (emphasis added). In *Davis*, the Supreme Court emphasized that it is not enough that the debtor has become chargeable as a trustee "ex maleficio" through the very act of wrongdoing out of which the disputed debt arose. *Reed*, 610 F.2d at 1338 (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 [1934]). Thus, the debtor "must have been a trustee before the wrong and without reference thereto." *Id.*

■ From the pleadings, RAI states that Patton's conduct itself gives rise to the "creditor relationship and the debt which plaintiff contends is owed to it" by Patton individually. RAI appears to assert a fiduciary duty owed to RAI arising from debtor's conduct to invoke the fiduciary bar to discharge under Section 523(a)(4). The Supreme Court's decisions make it clear that technical trusts, not implied trusts (those which the law implies from the contract), lead to a nondischargeable debt. *See Boyle*, 819 F.2d at 588 n. 12. Absent a showing on the record that the fiduciary duty arose "before the wrong and without reference to thereto", RAI cannot invoke the fiduciary bar against discharge of the disputed debt. *See Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985) (declining to find a fiduciary relationship for purposes of a Section 523(a)(4) fiduciary bar against discharge). Thus, although the evidence may support a finding of willful neglect, the evidence does not sustain a finding that a fiduciary relationship existed for purposes of a Section 523(a)(4) defalcation as required under title 11 to except a debt from discharge.

■ The other situation, giving rise to liability under Section 523(a)(6), was not pleaded by the plaintiff in this case, but even if it had been, the evidence did not establish the requisite malice to warrant a finding of nondischargeability. *See American Honda Finance Corp. v. Grier (In re Grier)*, 124 B.R. 229, 233 (Bankr.W.D.Tex. 1991); *see also Merchants National Bank v. Brouillet (In re Brouillet)*, 125 B.R. 341, 344 (Bankr.D.Mass.1991).

■ The court finds no error in its original conclusion that the plaintiff failed to establish all the requisite elements for a finding of nondischargeability under Section 523(a)(2). In its ruling, the court observed that the creditor had not reasonably relied on the misrepresentations made by the debtor, but had instead routinely made its credit extension decisions based on other information (or even no information at all).

As this court observed in *In re Grier*, the nondischargeability provisions protect creditors from opprobrious conduct in those circumstances where, but for the nondischargeability provisions, the creditor would be at the mercy of the debtor and his or her nefarious behavior. *American Honda Finance Corp.*, 124 B.R. at 231. When, however, creditors by their own laxity leave themselves vulnerable to scurrilous conduct, their loss is as much their own fault as it is the fault of the debtor. This court does not condone dishonesty in commercial relationships, but neither can it encourage creditors to sleep on their rights.

The motion is DENIED.

So ORDERED.