In re Thomas Merrill GAUBERT, a/k/a Thomas M. Gaubert, a/k/a Tom Gaubert, Debtor.

FEDERAL DEPOSIT INSURANCE COR-PORATION, as Manager of the FSLIC Resolution Fund, Plaintiff,

v.

Thomas M. GAUBERT, Defendant.

Bankruptcy No. 91–40779.
Adv. No. 91–4178.

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

Aug. 31, 1992.

Steve Teichler, John Veach and Timothy Durst, Baker, Botts, Washington, DC, Robert P. Franke, Thompson, Coe, Cousins & Irons, Dallas, TX, for plaintiff.

Weldon L. Moore, III, Robert M. Greenberg, Dallas, TX, for defendant.

1. Thomas Gaubert's brother Jack Gaubert is also relevant to the facts. References to Gaubert shall be references to Thomas Gaubert.

## MEMORANDUM OPINION FINDING DEBTS NON–DISCHARGEABLE

C. HOUSTON ABEL, Chief Judge.

Thomas M. Gaubert ("Gaubert") was the majority stock holder of Independent American Savings Association ("IASA"), and he also served as the chairman of the board. IASA was put into receivership. The Federal Deposit Insurance Corporation ("FDIC"), as manager for the FSLIC Resolution Fund, now seeks a determination that three debts are non-dischargeable. Two of the debts arose as loans that were made while Gaubert was acting in a fiduciary capacity. The third debt stems from payment Gaubert received for the sale of his stock to an employee stock ownership plan. After considering the evidence and the relevant law, the court concludes that each of these debts is non-dischargeable. The court has set forth its findings of fact and conclusions of law. Fed.R.Bankr.Proc. 7052(a). Where appropriate findings of fact shall be deemed conclusions of law, and conclusions of law shall be deemed findings of fact.

### Jurisdiction

The court obtained jurisdiction over this bankruptcy case under 28 U.S.C. sec. 1334, 28 U.S.C. sec. 157(a), and the standing order of reference. "[D]eterminations as to the dischargeability of particular debts" are core proceedings. 28 U.S.C. sec. 157(b)(2)(I).

### Findings of Fact

The court makes the following findings of fact:

THE PARTIES INVOLVED AND THEIR ROLES:

1. In January of 1983, Gaubert[1] acquired the majority of the Citizens Savings Association common stock, and he became the single largest shareholder of that entity and its successor, IASA.

2. IASA had set up an executive committee to approve loans. After the execu-

When referring to Jack Gaubert, the court will include Jack Gaubert's full name.

tive committee approved loans, the board of directors would ratify their actions.

3. From January 1983 through November 18, 1984, Gaubert served as the chairman of the board of directors of IASA. As the chairman of the board, it was part of Gaubert's duties to bring loan business to IASA. From early 1983 until May 20, 1987, Gaubert was the single largest shareholder of IASA. From January 1984 to August 1984, Gaubert served on the IASA executive loan committee.

4. Jack Gaubert is Gaubert's brother. From January 12, 1983 through April 7, 1986, he was the second largest shareholder of IASA, owning thirteen percent of the common stock, and during this time period he served on the board of directors. From June 1984 through April 7, 1986, he co-chaired the board of directors. He served on the executive loan committee from September 1984 through April 6, 1986, and he was a member of the senior loan committee from September 1984 to April 7, 1986.

5. Tommy G. Lane ("Lane") owned approximately five percent of the IASA common stock, and he was one of IASA's five largest shareholders. From April 1983 to April 28, 1986, Lane served on the board of directors of IASA and was its co-chairman from June 1985 to April 28, 1986. From January 1983 to April 28, 1986, Lane was IASA's chief executive officer. He was a member of the senior loan committee from September 1984 to March of 1986 and a member of the executive loan committee from January 1984 to March 1986. Lane and Gaubert were good friends.

6. Richard H. Crowe, Jr. was the third largest shareholder of IASA, and he also served as vice president and as an advisory member of IASA's board of directors. In addition to his involvement with IASA, he was president and chairman of the board of Independent American Real Estate, a subsidiary of IASA.

7. Edwin T. McBirney ("McBirney") was chairman of the board of Sunbelt Savings. He and Gaubert had a professional relationship as well as a friendship.

8. Frank Nigrelle was an officer of Pacific Panther Helicopters, and he was the person with whom Gaubert dealt when the Pacific Panther Helicopters loan was made. Nigrelle and Gaubert were involved in a partnership in which they owned an airplane.

THE BARFIELD LOAN:

9. IASA loaned $3,200,000 to Barfield Associates for the purchase of an office building ("Barfield building") located in downtown Amarillo, Texas ("Barfield loan"). Gaubert signed the minutes from the meeting where the Barfield loan was approved.

10. McBirney was a limited partner in Cirrus Equities. The office building was acquired from Commerce Savings, and it was an old building which needed repairs. Its problems included lack of parking, low occupancy, and deteriorated facilities. The building had lost money each of the preceding fifteen years. As Cirrus wanted to sell the building quickly, Gaubert was contacted to see if he was interested in purchasing or financing a purchase of the building.

11. At the time Gaubert was contacted about the Barfield building, Sunbelt Savings was negotiating the Cedar Hill and Trophy Club developments with Independent American Financial Services. Both of these transactions involved multi-million dollar loans.

12. Crowe advised Gaubert against investing in the Barfield building. Although Gaubert was not interested in acquiring the Barfield building, he was actively involved in having IASA make the loan. Gaubert wanted the loan to IASA to be made as an accommodation to McBirney.

13. When the Barfield loan was made, Cirrus Equities was able to record a profit of approximately $1.1 million. The building was purchased by Barfield Associates, and Jerry Fults was a general partner of Barfield Associates. Jerry Fults and McBirney had a business relationship.

14. The Barfield loan application, closing, and approval all occurred on the same day. Gaubert was on the board of directors which ratified the executive committee's approval of the loan. This ratifica-

tion occurred several weeks after the loan had closed.

15. Of the $3.2 million loan, approximately $1.1 million was paid to Cirrus Equities.

16. Ultimately, there was a default on the loan, and Crowe informed Lane that he was concerned Fults would argue the loan was made as a favor to Sunbelt and IASA. Fults ultimately filed a lawsuit in which he made these allegations.

17. The loan to Barfield Associates violated IASA's own underwriting policies and federal regulatory requirements. 12 C.F.R. sec. 563.17(a) (1984). Funding the loan based on a letter appraisal violated 12 C.F.R. sec. 563.17–1(c)(i)(iii) (1984).

18. The evidence demonstrates that Gaubert used his influence to promote a relationship with McBirney. They had a relationship where they did business favors for each other. The primary concern was getting the loan completed rather than making sure the loan was in the best interest of IASA. As a result, Gaubert was an integral part of ensuring that the requisite level of care was not exercised when the loan was made. His reckless actions promoted his own interests rather than those of IASA. IASA was harmed by the making of this loan and the inevitable default that resulted. IASA lost $1,911,000 as a result of this improper loan.

THE PACIFIC PANTHER HELICOPTERS/AMERICAN RESOURCES LOAN:

19. On August 8, 1983, IASA loaned Pacific Panther Helicopters ("PPH") $2,300,000 so PPH could purchase working interests in oil and gas wells. IASA made few oil and gas loans, and no one who reviewed the PPH loan had experience in the oil and gas area.

20. Nigrelle guaranteed the PPH loan. Nigrelle's credit check demonstrated he was not credit worthy because he had seven deficiency judgments against him.

21. Gaubert testified that initially Nigrelle was the only person who Gaubert knew at PPH and that Nigrelle approached him about the PPH loan. Gaubert explained the loan to Lane.

22. The loan was approved without a loan application and without a written appraisal of the collateral.

23. Gaubert was on the executive committee at the time the loan was approved, and he also was on the board of directors which ratified the loan approval.

24. Because of potential usury problems, the loan was ultimately restructured. As part of the restructuring agreement, Gaubert used his influence to arrange funding for Nigrelle from Sunbelt. The restructured loan agreement was entered into with American Resources rather than PPH, but American Resources was another entity controlled by Nigrelle.

25. When the restructured loan was made, no one updated the information about the loan. Gaubert was one of the members of the executive committee which approved this restructured loan, and he also was a member of the chairman of the board which approved the agreement. Although Gaubert suggests this failure to review the loan was reasonable because of the urgent need to address the usury issue, this argument ignores that the loan should have not been made in the first place. Even if the loan were proper in the first place, the evidence demonstrates that oil and gas prices were fluctuating during this time period. If the fiduciaries had been acting with care, they would have reassessed the collateral at the time of the restructuring. They then could have assessed the costs of a potential usury claim versus the costs of renegotiating the loan.

26. American Resources defaulted on the restructured loan.

27. The oil and gas loan to PPH was made because of Gaubert's influence. When making the loan, Gaubert and the others did not comply with governmental and internal regulations, and this failure to exercise the requisite standard of care is exacerbated because IASA was making a loan in an area in which the persons responsible lacked expertise. Gaubert's actions reflect he was acting with loyalty to a business associate rather than with loyalty to the interests of IASA. Gaubert's ac-

tions were reckless, and IASA lost $2,063,-649 as a result of this loan.

## THE EMPLOYEE STOCK OWNERSHIP PLAN:

28. On December 28, 1984, Gaubert and the FSLIC entered into an agreement (the "Neutrality Agreement") which required Gaubert to resign from all his IASA positions. Gaubert removed himself from the operation, management, and control of IASA.

29. Many witnesses testified that Gaubert was an industrious and dynamic leader, and the stockholders had confidence in him. When Gaubert signed the neutrality agreement, his brother Jack Gaubert replaced him. Jack Gaubert lacked Gaubert's business acumen, and he did not inspire confidence.

30. Because Jack Gaubert was not successfully developing IASA, the other investors wanted to remove him. The employee stock ownership plan initially was developed to purchase his stock.

31. The employee stock ownership plan ("ESOP") was designed to be a leveraged ESOP. An Employee Stock Ownership Trust would be established, the trustee would obtain a loan to fund the purchase of stock, and the shares of stock would be put up as collateral for the loan. ESOPs are designed to be pension or retirement plan for the benefit of the employees. The loan is repaid when the employees make contributions to the trust. The employees then have unencumbered shares of stock. If the shares of stock increase in value, the employees' pension fund grows. If the shares of stock decrease in value, the employees' pension fund shrinks.

32. ESOPs are designed to benefit employees, so the goal of removing Jack Gaubert was an impermissible purpose. Although some witnesses testified that removing Jack Gaubert was only an initial purpose and the purpose ultimately changed, the evidence does not demonstrate that a change in purpose ever occurred.

33. The shares of stock were valued by Richard P. Bernstein ("Bernstein"). Although Bernstein has extensive experience and impeccable credentials, he made some fundamental errors when he completed his valuation. He testified that some of these errors were the resulted from his reliance on faulty information that he had received from a member of IASA management. As a result of the errors in the appraisal, the value of the IASA stock was grossly overvalued.

34. The major inaccuracies in Bernstein's report were: improper allowance of gains from the Cedar Hill transaction, improper amortization of goodwill, inappropriate recognition of a put option, inappropriate recognition of a gain when there was actually a loss, and failure to delete the preferred stock from the total equity to obtain the proper value of the common stock.

35. Gaubert contends he zealously adhered to the terms of the Neutrality Agreement, so he had no involvement with the ESOP transaction.

36. Gaubert's witnesses testified Gaubert refused to help them obtain loans from IASA and he complied with the terms of the agreement. The court finds the testimony of these witnesses entirely credible, but the court also finds the testimony of the FDIC's witnesses credible.

37. The Neutrality Agreement put Gaubert in an unworkable position. He was concerned about the problems which had led to the Neutrality Agreement, and he knew it was in his interest to comply. On the other hand, he had a large amount of money invested in IASA. Without his leadership, IASA was floundering. To the extent he could comply, Gaubert did. But to the extent that fundamental decision needed to be made in order to preserve his investment, Gaubert controlled the voting of the stock by informing those who voted his stock how he wished them to vote. He remained in control of important decisions.

38. Crowe, Lane, and Brophy remained in contact with Gaubert.

39. Cedar Hill was a land sale in which Gaubert was actively involved. When the property was sold, IASA management wanted to record the entire sale as a gain.

As of September 30, 1985, Gaubert and other managers at IASA knew that if the $22 million Cedar Hill gain was removed from income, as the independent auditors had recommended, IASA would have a negative net worth. IASA would be closed.

40. The auditor had determined it would be improper to report the entire sale as a gain because it was really an installment sale.

41. Gaubert also knew that the put option should not have been reported because it was more in the nature of a rebate on the lease.

42. Crowe informed Gaubert about the problems with the goodwill amortization, and Gaubert knew this problem still existed when the ESOP was approved.

43. Gaubert had told members of IASA management that the stock should be valued between $34 and $36 per share.

44. First Benefit and IASA entered into an agreement, providing for a loan by IASA to First Benefit, as trustee for the ESOT, and stating that First Benefit was purchasing 184,238 of IASA common stock.

45. IASA loaned First Benefit $5,261,-782 for the purchase of IASA shares on behalf of the ESOP on January 1, 1986.

46. Ten days later, IASA received a wire transfer for $5,261,782 from First Benefit.

47. IASA transferred a single certificate representing 181,438 shares of IASA stock to First Benefit.

48. The loan approval sheet for the loan to First Benefit was dated February 10, 1986.

49. When the ESOP trustee learned of the valuation problems, the trustee requested that the funds be returned. Gaubert did not return the money.

50. Although aware of problems with the valuation of the stock, Gaubert did not report these problems to IASA or the ESOP trustee. Instead, Gaubert sold 85,-824 shares of IASA stock to the trust. He received a check from IASA for the purchase of his shares of stock.

51. Gaubert knew the stock was not worth $29 per share. Two months after he sold the stock he valued it at $19.52 per share on his personal financial statement dated December 31, 1985.

52. The entire ESOP transaction benefitted Gaubert while harming IASA and its employees. His actions demonstrate a knowing disregard of the duties of loyalty and care.

53. As a result of his breach of fiduciary duty, IASA lost $5,261,702 on the ESOP transaction.

### Conclusions of Law

The FDIC contends that the Barfield, PPH and ESOP claims are each non-dischargeable under section 523(a)(4). Section 523(a)(4) provides that debts, "for fraud or defalcation while acting in a fiduciary capacity...." are non-dischargeable. 11 U.S.C. sec. 523(a)(4). The FDIC thus must show that the Debtor was acting in a fiduciary capacity and that fraud or a defalcation occurred.

A. Was the Debtor a Fiduciary of IASA?

■ The existence of a fiduciary relationship is a question of federal law under section 523(a)(4). Section 523(e) of the Bankruptcy Code specifies that institution affiliated parties shall be considered fiduciaries as contemplated by section 523(a)(4), 11 U.S.C. sec. 523(e). The Bankruptcy Code adopts the banking law definition of institution affiliated party. 11 U.S.C. sec. 101(33)(A). The Federal Deposit Insurance Act ("FDIA") defines an institution affiliated party as:

(1) any director, officer employee or controlling stockholder (other than a bank holding company) of an insured depository institution; ... [and]

(3) any shareholder ..., consultant, joint venture partner, and any other person as determined by the appropriate federal banking agency (by agency or case-by-case basis) who participates in the conduct or the affairs of an insured depository institution....

12 U.S.C. sec. 1813(u). As IASA was insured by the Federal Savings and Loan

Insurance Corporation, it was an insured depository institution. 12 U.S.C. sec. 1813(c)(2); 12 U.S.C. sec. 1814(a)(2). The question remaining is whether Gaubert falls within the categories which make him a fiduciary.

■ Section 523(e) of the Bankruptcy Code was added when the Crime Control Act of 1990 was enacted. Although the Bankruptcy Code does not specify whether this provision is prospective or retroactive, the Supreme Court has indicated that the legislative history should be the first guide when considering prospectivity or retroactivity. *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835–36, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990). With regard to section 523(e), "[t]he Congressional intent is clear that the officers and directors who were most responsible for the collapse of the savings and loan industry would not be allowed to discharge the debts which accrued due to their improprieties." *In re Chavez*, 140 B.R. 413, 420 (Bankr.W.D.Tex.1992) (citing H.R.Rep. No. 101–681(I), 101st Cong., 2d Sess. 180–81 (1990), *reprinted in*, 1990 U.S.C.C.A.N. 6472, 6586–87). As noted during discussion of the amendment, "[t]hese are changes to the Bankruptcy Code which close off the bankruptcy escape hatch for bank and thrift insiders whose acts of financial fraud and malice will end up adding perhaps half a trillion dollars to the Federal debt. These provisions are narrowly crafted to hit only those who committed the worst abuses in the heyday of the Reagan deregulation era. But for those few who have been at the helm of one of the worst financial scandals in history, the hit will be hard." 136 Cong.Rec. H13,288; 13,289 (1990). As the courts have held in other banking contexts that institution affiliated parties are fiduciaries, and as Texas law provides that directors and controlling shareholders owe fiduciary duties to a corporation [2], the Bankruptcy Code does not alter the effect of being an

institution affiliated party. *See e.g. Akin v. Office of Thrift Supervision*, 950 F.2d 1180, 1182 (5th Cir.1992) (institution affiliated parties were fiduciaries); *Duncan v. Lichtenberger*, 671 S.W.2d 948, 952 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e) (director owes fiduciary duty under Texas law); *Schautteet v. Chester State Bank*, 707 F.Supp. 885, 889 (E.D.Tex.1988) (construing Texas law and determining that majority shareholder was fiduciary). Section 523(e) merely clarifies that existing fiduciary standards apply when evaluating dischargeability under section 523(a)(4).

1) The Debtor was a fiduciary when the Barfield and the PPH loans were made.

■ During all time periods relevant to the Barfield and PPH loans, the Debtor was an institution affiliated party. Between January 1983 and November 1984, the Debtor was IASA's chairman of the board, and he was the controlling shareholder. The Debtor owed a fiduciary duty to IASA during this period because he was an institution affiliated party.

2) The Debtor was a fiduciary when the Employee Stock Ownership Plan was adopted.

■ The analysis of the fiduciary duty issue differs during the time period when the employee stock ownership plan was adopted. When the ESOP was authorized, the Debtor was subject to an agreement which required him to refrain from controlling IASA, and this agreement specified that control would not be determined by the majority ownership of the stock.

The FDIC contends this agreement predated the Crime Control Act, and that the definition of control could not limit the meaning of control in the Crime Control Act. The FDIC then argues that the Crime Control Act defines institution affiliated parties by their status rather than by their

---

**2.** "The issue of the existence of a fiduciary duty is a question of federal law for [s]ection 523(a)(4) purposes. State law, however, plays an important role in determining the existence of a trust relationship." *In re Chavez*, 140 B.R.

413, 422–23 (Bankr.W.D.Tex.1992) (construing *In re Black*, 787 F.2d 503, 506 (10th Cir.1986) and *In re Johnson*, 691 F.2d 249, 251 (6th Cir. 1982)).

degree of involvement with the management of the banking institution. The FDIC suggests this reading is supported by *Chavez* because the *Chavez* court equates majority stockholder with controlling stockholder.

The court agrees with the first prong of the FDIC's argument. Clearly, the FSLIC could not define control for purposes of the Crime Control Act. The court is not persuaded, however, that the Crime Control Act defines control by status only, nor does the *Chavez* case indicate support that reading. The *Chavez* court underscored the reference to controlling shareholder in its opinion. *Chavez*, 140 B.R. at 422. While the *Chavez* court did explain that "even a majority shareholder" could be a fiduciary under section 523(a)(4), *Chavez*, 140 B.R. at 422, the court did not say all majority shareholders. The *Chavez* court did not have the facts of this case before it, and this court does not read the language of that opinion as supporting a determination that *all* majority shareholders are fiduciaries as required by section 523(a)(4).

If Congress wanted ownership alone to be the relevant factor, it could have used the phrase "majority shareholder" instead of "controlling shareholder". Alternatively, Congress could have defined control as including a certain amount stock ownership as it did when it defined control of bank holding companies. 12 U.S.C. sec. 1841(a)(2)(A).

As Congress did not define controlling stockholder, the normal usage of the term "control" is the appropriate standard. *Black's Law Dictionary* defines "control" as the "[p]ower to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." *Black's Law Dictionary* 329 (6th ed.1990). Similarly, the Fifth Circuit, when considering whether an individual is a controlling stockholder, has focussed on the role of the individual. In *Garrett v. United States*, 396 F.2d 489 (5th Cir.), *cert. denied*, 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968), the Fifth Circuit determined that individuals who had purchased stock and put it in other people's names were controlling stockholders. *Garrett*,

396 F.2d at 490. The court explained that the stockholders' selection of board members and involvement in bank activities established their exercise of control. *Garrett*, 396 F.2d at 490.

The purpose of the Neutrality Agreement with the Office of Thrift Supervision was to remove the Debtor from the function the *Garrett* court viewed as establishing control. In essence the FDIC suggests the Debtor was in the untenable position of remaining a fiduciary even though he had no way to exercise or enforce his fiduciary duties. This construction of the statute would force individuals who remove themselves from control to sell stock to avoid fiduciary liability. Such forced sales would no doubt result in lower prices from the sale of bank stock, and this result is undesirable.

Under the facts of this case, however, Gaubert did not truly remove himself from the controlling position. In *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919), the Supreme Court noted that the proper concern is not the means with which the control is exercised but the fact of control. *Bogert*, 250 U.S. at 492, 39 S.Ct. at 537. As another court stated in an analogous context, "[w]e are concerned with actual control and economic reality, not paper facades." *Hildebrand v. United States*, 563 F.Supp. 1259, 1261 (D.N.J.1983). The evidence in this case demonstrates the Neutrality Agreement was a paper facade. The Debtor remained in actual control by communicating with board members and controlling their actions. As the Debtor did not truly give up his control of IASA, he remained a fiduciary.

**B. Was there a defalcation?**

The landmark defalcation case in the Fifth Circuit is *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417 (5th Cir.1990). In *Moreno*, the Fifth Circuit said, "[a] defalcation is a *willful* neglect of duty, even if not accompanied by fraud or embezzlement." *Moreno*, 892 F.2d at 421 (citations omitted) (emphasis added). As the FDIC correctly notes, the Fifth Circuit previously

held that intent was not necessary to establish a defalcation. In *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir.1980), the Fifth Circuit held that intent was not a necessary prerequisite to establishing a defalcation. *Carey Lumber*, 615 F.2d at 376 (interpreting section 17(a)(4) of the Bankruptcy Act, the predecessor to section 523(a)(4)). As the Fifth Circuit has held that intent is not necessary to establish a defalcation, the FDIC asserts a mere breach of fiduciary duty suffices.

The court has found no Fifth Circuit precedent which squarely addresses the FDIC's arguments. In *Federal Deposit Ins. Corp. v. Mmahat*, 907 F.2d 546 (5th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991), the Fifth Circuit affirmed a court which denied discharge under section 523(a)(4) to a debtor who had breached his fiduciary duty. *Mmahat*, 907 F.2d at 550. In discussing the affirmance, the court did not address whether a mere breach sufficed, and the court's discussion of the facts indicates the Debtor had knowledge and intent to benefit from his actions. *Mmahat*, 907 F.2d at 549–50. Although the court can find no binding Fifth Circuit precedent, one lower court implicitly agrees with the FDIC's analysis. The *Chavez* court held that a breach of fiduciary duty meets the requirements for establishing a defalcation. *Chavez*, 140 B.R. at 424.

The court respectfully declines to follow the *Chavez* court's holding that a mere breach of fiduciary duty establishes defalcation. This court's construction of the defalcation requirement gives meaning to the word willful as used in *Moreno*, and it is entirely consistent with the underlying tenets of bankruptcy. It is the purpose of bankruptcy to give a fresh start to good faith debtors. *Grogan v. Garner*, 498 U.S. 279, —, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Certain types of debts, including those arising under section 523(a)(4), are excepted from discharge because the debtor has behaved wrongfully. *Grogan*, 498 U.S. at —, 111 S.Ct. at 659. While the *Chavez* court suggests that a negligent breach of a fiduciary duty is sufficient, that construction is not consistent with the type of conduct that traditionally has been excepted from discharge.

*Carey Lumber* does not eviscerate the court's holding, but is consistent with it. Although the FDIC equates willful and intent, they are not always synonymous. The Supreme Court has noted in several different opinions that the term "willful" has different meanings in different contexts. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Murdock*, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933). In fact, the term "willful" in section 523(a)(6), which prohibits discharge of debts "for willful and malicious injury," has altered as bankruptcy legislation has evolved. *See In re Compos*, 768 F.2d 1155, 1157–58 (10th Cir. 1985) (Prior use of term willful required showing of reckless disregard. Congress changed meaning, and now willful means deliberate and intentional).

The Supreme Court's has explained that "although [willful] has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent." *McLaughlin*, 486 U.S. at 133, 108 S.Ct. at 1681. As a mere breach of fiduciary duty is negligent, the *Moreno* court's use of the term "willful" takes mere breaches of duty out of the defalcation category. On the other side, the *Carey Lumber* decision demonstrates that a standard that is less than intent is appropriate. It is consistent with the term willful and the purposes of the Bankruptcy Code to impose a standard of recklessness.

The usual meaning assigned to 'willful' ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. Since, however, it is almost never admitted and can be proved only by the conduct and the circumstances, an

objective standard must of necessity be applied.

W. Page Keeton, *Prosser and Keeton on The Law of Torts* 213 (5th ed.1984) (citations omitted). A noted commentator refers to the requisite state of mind as "quasi-intent." Keeton, *supra* at 212 (citations omitted). The court adopts the Prosser and Keeton guidelines for evaluating willfulness in the context of a defalcation.

Other courts implicitly have agreed that more than a mere breach of duty must be shown. In *Gravel v. Roy (In re Roy)*, 130 B.R. 214 (Bankr.W.D.La.1991), the court closely analyzed *Moreno* and *Carey Lumber*. *Roy*, 130 B.R. at 220–23. The court properly recognized that under *Carey Lumber* the Debtor is not required to show subjective intent, and the court applied an objective standard. *Roy*, 130 B.R. at 221–22. The court concluded, "It is sufficient here that Roy's acts were willful, for he is charged with the knowledge of the duty." *Roy*, 130 B.R. at 222.

In *In re Patton*, 129 B.R. 113 (Bankr. W.D.Tex.1991), the court noted, "Defalcation is defined as a 'willful neglect of duty ...' and does not require intentional misconduct." *Patton*, 129 B.R. at 117 (citing *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir.1990) and *Advance–United Expressways, Inc. v. Wines (In re Wines)*, 112 B.R. 44, 45 (Bankr.S.D.Fla. 1990)). This language demonstrates the court's recognition that willful and intent are not fungible terms. Although the *Patton* court did not expressly state that a distinction should be drawn between willful under section 523(a)(6) and willful for purposes of a defalcation under section 523(a)(4), the court explained that there is an important difference between tortious acts of an individual and tortious acts of "an individual as an officer of a corporation, itself charged with acting tortiously toward the creditor." *Patton*, 129 B.R. at 117. When dealing with a fiduciary, it is appropriate to impose a lower threshold than imposed under other provisions of the bankruptcy code. Yet this court finds no support in the language from Fifth Circuit precedent that the standard is so low that a mere breach of the duty makes the debt

non-dischargeable. The breach must be reckless.

### C. Fiduciary Duties of Institution Affiliated Parties.

Traditionally, fiduciaries have been required to comply with two duties. *Chavez*, 140 B.R. at 424. First, they must exercise due care when managing the corporation's affairs. *Meyers v. Moody*, 693 F.2d 1196, 1209 (5th Cir.1982), *cert. denied*, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). The standard of care requires that they use the care that an ordinary prudent person would use under the same circumstances. *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719–20 (5th Cir. 1984). Second, they owe a duty of loyalty to the organization, and they must avoid acting in their own self interest. *Gearhart*, 741 F.2d at 719–20. One commentator has emphasized, "[t]he rules governing fiduciary duty should be applied even more stringently to an officer and director of a bank who should be concerned with the welfare of depositors as well as that of customers and stockholders. The law demands the fullest disclosure and fair dealing by a director or officer in his relations with a bank." William M. Fletcher, *Fletcher Encyclopedia of the Law of Private Corporations* sec. 838 (1986). Gaubert recklessly disregarded these standards.

### CONCLUSION

The evidence in this case establishes that Gaubert willfully violated his fiduciary duties of care and loyalty with regard to the Barfield, PPH/American Resources, and ESOP transactions. As the FDIC has met its burden, the court will enter a judgment finding each of these debts non-dischargeable. As the court has determined the debts are non-dischargeable under section 523(a)(4), it is unnecessary to reach the section 523(a)(2)(A) cause of action. Although it might have been necessary to consider the section 523(a)(6) action if the FDIC had sought punitive damages, the FDIC did not seek punitive damages. The

court thus concludes it is not necessary to address section 523(a)(6).